1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LARRY BESS, JR.,

11          Plaintiff,                    No. CIV S-03-2498 GEB DAD P

12       vs.

13   EDWARD S. ALAMEDA, JR., et al.,

14          Defendants.            <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16          Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17   relief under 42 U.S.C. § 1983.  The matter is before the court on defendants' motion for summary

18   judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has filed

19   opposition to the motion.  Defendants have not filed a reply.

20                              BACKGROUND

21          Plaintiff is confined at Mule Creek State Prison.  On December 1, 2003, he filed a

22   complaint against Edward Alameida, Jr., then director of the California Department of

23   Corrections; Mike Knowles, then warden of Mule Creek; and Mike Valdez, then community

24   resources manager of Mule Creek.  Plaintiff alleged that these defendants were violating inmates'

25   religious freedom by censoring religious mail and creating a substantial burden on inmates'

26   exercise of religious freedom.  Plaintiff sought damages and injunctive relief.

1

1        Plaintiff's complaint was dismissed as so vague and conclusory that the court

2  could not determine whether the allegations stated a cognizable claim for relief.  Plaintiff filed an

3  amended complaint on April 21, 2004.  The court determined that the amended pleading stated

4  cognizable claims against defendants Alameida, Knowles, and Valdez.  In response to the court's

5  order requiring plaintiff to submit documents for service of process, plaintiff failed to submit a

6  USM-285 form for one defendant, submitted a USM-285 form for an individual not named in the

7  amended complaint, and did not submit true copies of the amended complaint.  The court

8  construed plaintiff's submissions as an attempt to further amend his pleading.  Plaintiff was

9  granted leave to file a second amended complaint.

10        On July 15, 2004, plaintiff filed his second amended complaint, which is the

11  operative pleading in this action.  The court determined that the second amended complaint states

12  cognizable claims against defendants Alameida, Knowles, and Valdez, as well as Jeanne

13  Woodford, then the new director of the California Department of Corrections.  Service was

14  effected, and defendants filed an answer on February 28, 2005.  The court issued a discovery

15  order on March 4, 2005.  Soon after the court directed the parties to file status reports, defendants

16  filed their motion for summary judgment.  Plaintiff requested additional time to prepare a status

17  report and oppose defendants' motion.  The order requiring status reports was vacated, and

18  plaintiff was granted an extension of time to file opposition to defendants' motion.  Discovery

19  has been stayed pending adjudication of the motion, and no scheduling order has been issued.

20                         PLAINTIFF'S CLAIMS

21        In his second amended complaint, plaintiff alleges as follows:  Mule Creek State

22  Prison ("MCSP") Operational Procedure 53050, dated February 1, 2002, was introduced by

23  defendant Valdez, the community resource manager.  The procedure was signed by defendant

24  Knowles under the authorization of defendant Alameida, who was the director of the California

25  Department of Corrections ("CDC").  Under this procedure, mail room staff were returning

26  religious mail to the sender marked "unauthorized," without notice to the inmate and in violation

1   of an institutional memorandum, the departmental operations manual, and state regulations.  The

2   procedure places a substantial burden on inmates' religion and violates the First Amendment and

3   the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").

4          Plaintiff contends that defendants' procedure places religious materials under

5   quarterly package restrictions for no reason other than to restrict religious practices.  He asserts

6   that the effect of the procedure is to place a burden on religious materials that is not placed on

7   secular materials.  Plaintiff makes the following factual allegations in support of these

8   contentions:  inmates may order any number of non-religious books once every thirty days but

9   may order only one religious book once every ninety days; a religious calendar sent to an inmate

10  was returned to the sender solely because the calendar was religious, although secular calendars

11  are permitted; a publication titled "Me and My Big Mouth" was sent to plaintiff by Joyce Meyers

12  Ministries but was returned marked "unauthorized," and plaintiff learned of the return only when

13  he received a letter from Joyce Meyers Ministries; an inmate who wants to order a religious book

14  must obtain approval at three levels, but three levels of approval are not required for secular

15  publications.

16         Plaintiff states that, although revisions were made to the procedure in response to

17  his claims, such recognition of the violation of his rights is not sufficient.  Plaintiff seeks (1) a

18  broad injunction prohibiting severe religious burdens at MCSP, (2) an order directing mail room

19  staff not to separate mail into religious mail and regular mail and not to reject religious mail from

20  approved vendors just because the particular item is not on the approved list, and (3) an order

21  prohibiting the CDC from censoring religious mail.  Plaintiff also seeks damages for pain,

22  suffering, and mental anguish.

23         Although plaintiff's second amended complaint does not cite the Due Process

24  Clause or the Equal Protection Clause of the Fourteenth Amendment, the factual allegations of

25  the pro se pleading appear to support such claims.  In his opposition to defendants' motion, he

26  argues that defendants' violated his rights to due process and equal protection.

STANDARDS APPLICABLE TO A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated by a party that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party may seek summary judgment upon all or any part of another party's claims.  Id.  The moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  Summary judgment should be granted "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue as to any material fact does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits and/or admissible discovery material in support of the contention that a dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.

1        The party opposing summary judgment must show that any fact in contention is

2  material, i.e., a fact that might affect the outcome of the suit under the governing law, and that

3  the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

4  the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); T.W. Elec. Serv. v.

5  Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987); Wool v. Tandem Computers,

6  818 F.2d 1433, 1436 (9th Cir. 1987).  In trying to establish the existence of a factual dispute, the

7  party opposing summary judgment need not establish a material issue of fact conclusively in his

8  or her favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge

9  to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

10  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

11  order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting

12  Fed. R. Civ. P. 56(e) Advisory Comm. note on 1963 amends.).

13        The evidence of the party opposing summary judgment is to be believed, and all

14  reasonable inferences that may be drawn from the facts placed before the court must be drawn in

15  favor of the party opposing summary judgment.  Anderson, 477 U.S. at 255; Matsushita, 475

16  U.S. at 587.  Inferences will not be drawn out of the air, however; it is the opposing party's

17  obligation to produce a factual predicate from which an inference may be drawn.  Richards v.

18  Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

19  (9th Cir. 1987).  The opposing party "must do more than simply show that there is some

20  metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not

21  lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

22  Matsushita, 475 U.S. at 587 (citation omitted).

23        By the order filed in this case on December 22, 2004, plaintiff was advised of the

24  requirements for opposing a defendant's motion for summary judgment pursuant to Rule 56.  See

25  Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d

26  409, 411-12 (9th Cir. 1988).

THE PARTIES' ARGUMENTS AND EVIDENCE

I. Defendants' Motion

Defendants summarize the case as follows:  (1) plaintiff, who is a Catholic, ordered a Christian study guide that was a companion to a book he already had, (2) prison officials returned the study guide to the sender because plaintiff had not followed prison policies and procedures then in effect for receiving such publications, (3) plaintiff did not reorder the book when advised of the proper method for obtaining the publication, and (4) plaintiff claims that the return of the publication substantially burdened his practice of religion in violation of the First Amendment and the RLUIPA.

Defendants' statement of undisputed facts is supported by citations to plaintiff's second amended complaint, plaintiff's deposition testimony, and the declaration of Earl Kanipe, the litigation coordinator for MCSP.  Attached to the Kanipe declaration are copies of six documents: (1)  MCSP Departmental Operations Manual ("DOM") Supplement § 53050 January 2002 revision, issued by defendant Knowles; (2) MCSP DOM Supplement § 53050 May 2002 revision, issued by defendant Knowles; (3) MCSP DOM Supplement § 53050 May 2003 revision, issued by defendant Knowles; (4) MCSP Package Rejection/Return Notice form; (5) MCSP Memorandum dated November 19, 2002, from defendant Knowles, titled "Religious Packages/Bulk Mail"; and (6) MCSP DOM Supplement § 53050 December 2003 revision, issued by acting warden Scott Kernan.  (See Second Am. Compl. filed July 15, 2004; Apr. 13, 2005 Dep. of Larry Bess lodged July 14, 2005; Defs.' Statement of Undisputed Facts, Ex. A (Decl. of Earl Kanipe dated May 16, 2005) & Attachs. 1-6.)

The undersigned finds that defendants' evidence establishes the following facts concerning plaintiff's religious mail:  in late 2002 or early 2003, Joyce Meyer Ministries mailed plaintiff a study guide for a book titled "Me and My Big Mouth"; plaintiff already had a copy of the book; prison officials returned the study guide to the vendor because plaintiff had not obtained prior approval for the study guide; staff did not notify plaintiff of the rejection and

1   return of the study guide; plaintiff was unaware of the approval procedure when he requested the

2   study guide; plaintiff was unaware that the study guide was sent and rejected until he received a

3   letter dated February 20, 2003, from Joyce Meyer Ministries informing him that they sent him the

4   study guide but it was returned marked "unauthorized"; plaintiff did not attempt to use the

5   approval procedure to obtain the study guide after he learned it had been sent and returned; the

6   return of the study guide in 2002 or 2003 is the only instance since 1997 in which a religious

7   publication requested by plaintiff was not delivered to him; after the return of the study guide,

8   plaintiff used the procedure to obtain other religious publications.

9           The undersigned finds that defendants' evidence establishes the following facts

10   concerning the May 2002 policy that appears to have been in effect at MCSP when plaintiff

11   requested the study guide for "Me and My Big Mouth":  mail containing religious publications

12   were to be sent to MCSP only by approved vendors and only after the inmate obtained prior

13   approval for the publications; the purpose of the procedure may have been to eliminate the

14   opportunity for outside parties to introduce contraband into packages; all packages, even if pre-

15   approved, were inspected on receipt at MCSP; the MCSP pre-approval procedure for religious

16   publications was an added security measure rather than a substitute for the package inspection

17   process; in order to obtain a religious publication, including those available to prisoners at no

18   charge, an inmate was required to submit a Religious Purchase Order Request Form, SP-R1, for

19   approval by his chaplain, the community resources manager, and receiving and release staff; if

20   the inmate's SP-R1 form was approved by his chaplain, the community resources manager, and

21   receiving and release staff, the inmate was required to complete a second form, SP-R2, and send

22   the SP-R2 form to the approved vendor with the inmate's request or order for a religious

23   publication; the vendor was required to place a proper label on the package and place the

24   vendor's stamp on the SP-R2 form before mailing the package to the inmate; unauthorized

25   packages were returned by staff; the policy provided that staff were to notify the inmate on Form

26   571 Package Rejection/Return Notice when a package was received and rejected.

1    The undersigned finds that defendants' evidence establishes the following facts

2 concerning CDC and MCSP policy regarding religious publications in 2002:  DOM § 53050 in

3 effect in 2002 did not address religious mail; MCSP Supplement to DOM § 53050 as revised

4 January 2002 addressed the approval and purchase of sacramental wine and religious artifacts,

5 such as rosaries, prayer shawls, prayer rugs, medicine bags, and medallions, but did not address

6 religious publications, literature, or mail; MCSP Supplement to DOM § 53050 as revised May

7 2002 addressed religious mail; the May 2002 Supplement authorized inmates to receive mail

8 from religious organizations for their personal use but provided that mail containing multiple

9 copies of an item would be returned to the sender at the inmate's expense or disposed of; the

10 May 2002 Supplement prohibited the receipt of religious books, whether free or purchased,

11 except for soft-cover books for which prior approval was obtained; to obtain a religious book at

12 MCSP, an inmate was required to complete form SP-R1, identifying the organization that would

13 send the books; after receiving approval at all three levels, the inmate was required to send form

14 SP-R2 to the organization, and the organization was required to include the form when the book

15 was shipped to MCSP; an inmate was permitted to used the religious book approval process only

16 once per quarter; religious mail not including publications was to be processed in accordance

17 with the institutional policies applicable to all other mail; in a memorandum dated November 19,

18 2002, and addressed to all inmates, defendant Knowles informed inmates that MCSP Supplement

19 to DOM § 53050 had been revised because "many problems involving the processing of religious

20 mail" had been identified in the past year; the problems involving the processing of religious

21 mail are not described in the memorandum; defendant Knowles instructed inmates to notify

22 religious organizations and their family and friends of the policy and process for mailing

23 religious mail and religious materials to MCSP; defendant Knowles warned inmates that the

24 policy would be strictly enforced beginning January 1, 2003; defendant Knowles noted that

25 "[a]pproved religious items sent at no charge to you such as bibles, religious text or tapes must

26 be approved via the special religious package order process," all purchases of authorized

8

1   religious items and artifacts must be approved via the special religious order process, religious

2   items sent without prior approval would be returned at inmate expense, and the special religious

3   order process could be used only once per quarter per inmate; in declarant Kanipe's opinion,

4   plaintiff should have received a copy of the November 19, 2002 memorandum because it was

5   addressed to all inmates and the practice was to send a copy of such a memorandum to the

6   captain of each facility, for each captain to employ the assistance of the Men's Advisory

7   Committee to issue a copy to each inmate in the unit and to post a copy in each housing unit, and

8   for building officers to be instructed to make sure the warden's memorandum was posted.

9           The undersigned finds that defendants' evidence establishes the following facts

10  concerning MCSP policy and procedures regarding religious publications after plaintiff's study

11  guide was returned prior to February 23, 2003:  the MCSP Supplement to DOM § 53050 was

12  revised again in May 2003; under the May 2003 revision, inmates were permitted to use the

13  special religious purchase process once per month instead of once per quarter, but the approval

14  requirements and procedures were not changed; the MCSP Supplement to DOM § 53050 was

15  revised yet again in December 2003; the December 2003 revision contains the policy in effect at

16  MCSP when defendants' motion for summary judgment was filed in July 2005; under the

17  December 2003 revision, all religious mail is to be processed like other mail; if an inmate

18  receives religious mail that contains multiple copies of an item, one copy of the item is to be

19  forwarded to the inmate and the remaining copies are to be forwarded to the chapel for

20  distribution or use; inmates may purchase soft-cover religious books from approved vendors and

21  may receive soft-cover books from religious organizations and publishers that provide such

22  books to inmates and institutions at no charge; bound text material must come directly from a

23  religious organization or publisher, must be properly addressed to a specific inmate, and must

24  have the return address of the organization or publisher affixed to the outside of the package;

25  bound books are issued to inmates as property and recorded on their property cards; non-bound

26  literature, such as pamphlets, sent by religious organizations and publishers will be forwarded to

1  inmates as regular mail, except that catalogs will be forwarded to the chapel for general use by

2  inmates; each inmate is allowed to make a special religious purchase from an approved vendor

3  once per month; to obtain religious materials, an inmate must complete form SP-R1 and submit it

4  to the chaplain, who will forward the form for approval by the associate warden for programs and

5  housing; if the request is approved by the associate warden, the form is forwarded to receiving

6  and release for processing; a copy of the SP-R1 form is sent to the vendor with the inmate's

7  order; the form SP-R2 is no longer used; the vendor is required to return a copy of the SP-R1

8  form with the package containing the religious materials ordered by the inmate; if a package is

9  received at MCSP without the approved form, the package will not be returned but will be

10  forwarded by receiving and release staff to the associate warden for possible approval; under the

11  December 2003 revision, it is not necessary to use the pre-approval process for study guides like

12  the one sent to plaintiff and returned in late 2002 or early 2003, as such items are processed as

13  regular mail.

14          Defendants' statement of undisputed facts concludes with two itemized facts

15  concerning defendants Woodford and Alameida.  Defendants state that plaintiff has sued

16  defendant Woodford, who became CDC director on February 19, 2004, and defendant Alameida,

17  the previous director, because these defendants governed the CDC and not because either

18  defendant took part in depriving plaintiff of a religious publication.  (Defs.' Statement of

19  Undisputed Facts at 4, Nos. 20 & 21.)  Defendants cite plaintiff's deposition testimony.  The

20  undersigned has read the deposition transcript and finds that plaintiff's testimony does not

21  support defendants' assertion as to plaintiff's claims against defendant Alameida.  (See Bess

22  Dep. at 36:18-25; 37:7-20; 38:14-19; 39:5-11; 40:12-14; 68:7-16.)[1]  Defendants' motion contains

23  no citation to Undisputed Fact No. 20 or No. 21, although the date on which defendant Woodford

24  ───────────────

25          [1]  Rather, the cited portions of plaintiff's deposition indicate that he has sued defendant
        Alameida for authorizing and approving institutional policies that caused the alleged violations
        and for denying plaintiff's inmate appeal, either personally or through staff acting under his
26      authority, thereby failing to ensure the constitutionality of prison policies.

1  commenced her employment as CDC director is mentioned in a footnote in which defendants

2  deny that defendant Woodford is liable for damages arising from the policies in effect at MCSP

3  when the study guide was returned.

4          Defendants argue that they are entitled to summary judgment on plaintiff's First

5  Amendment claim because the policies in effect at MCSP at the relevant time were reasonably

6  related to legitimate penological interests and satisfied constitutional mandates.  Defendants

7  argue that they are entitled to summary judgment on plaintiff's RLUIPA claim because the law

8  and facts do not support the claim that defendants interfered with or substantially burdened his

9  free exercise of religion.  Defendants assert that the Supreme Court's recent decision concerning

10  RLUIPA, Cutter v. Wilkinson, ___U.S.___, 125 S. Ct. 2113 (2005), stands for the proposition

11  that the compelling state interest/least restrictive means test under RLUIPA in the prison context

12  is equivalent to, and should reach the same results as, the reasonably-related-to-legitimate-

13  penological-interest test established by Turner v. Safley, 482 U.S. 78, 89 (1987).  Defendants

14  also assert the defense of qualified immunity and seek summary judgment on plaintiff's claims

15  for money damages.

16  II.  Plaintiff's Opposition

17          Plaintiff's typed opposition is comprised of a six-page preliminary statement, a

18  twenty-five page memorandum of points and authorities, a two-page conclusion, extensive

19  documentary evidence, and plaintiff's own declaration.  Plaintiff did not reproduce and admit or

20  deny each fact itemized in defendants' statement of undisputed facts.  Nor did plaintiff present

21   his own concise statement of disputed facts, as permitted, or the statement of undisputed facts

22  required for a counter-motion for summary judgment.[2]

23  _____

24          [2] "Each motion for summary judgment . . . shall be accompanied by a 'Statement of
   Undisputed Facts' that shall enumerate discretely each of the specific material facts relied upon
   in support of the motion and cite the particular portions of any pleading, affidavit, deposition,

25  interrogatory answer, admission or other document relied upon to establish that fact."  Local Rule
   56-260(a).  A party opposing a motion for summary judgment "shall reproduce the itemized facts

26  in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those

1          Plaintiff argues that defendants are not entitled to summary judgment on his First

2   Amendment claim because there is no valid, rational connection between the restriction of

3   religious publications that have not been pre-approved and defendants' interest in preserving

4   security.  Plaintiff argues that defendants are not entitled to summary judgment on his RLUIPA

5   claim because the law and the facts support his claim that the defendants interfered with or

6   substantially burdened his right to the free exercise of his religion.  Plaintiff disputes defendants'

7   entitlement to qualified immunity on the ground that, as in Ashker v. California Department of

8   Corrections, 350 F.3d 917 (9th Cir. 2003), the defendants arbitrarily and discriminatorily

9   imposed a policy that was not rationally related to a legitimate penological objective, in violation

10  of the First Amendment, due process, and equal protection.  Citing the decisions in Prison Legal

11  News v. Lehman, 397 F.3d 692 (9th Cir. 2005) and Turner, 482 U.S. at 90, plaintiff argues that

12  the discriminatory pre-approval procedures preclude qualified immunity for the defendants.

13         Plaintiff argues in conclusion that there are disputed issues of material fact

14  requiring resolution by a jury and that defendants are not entitled to summary judgment under

15  any legal theory they have advanced.  (Pl.'s Opp'n to Def'ts' Mot. for Summ. J. at 32-33.)

16  Plaintiff argues in the alternative that he is entitled to summary judgment because defendants

17  cannot overcome his evidence that the defendants violated his rights under the First Amendment

18  and RLUIPA as well as his rights to due process and equal protection.  (Id. at 33.)

19  /////

20  /////

21  /////

22  /////

23

24  that are disputed, including with each denial a citation to the particular portions of any pleading,
    affidavit, deposition, interrogatory answer, admission or other document relied upon in support
    of that denial."  Local Rule 56-260(b).  A party opposing a motion for summary judgment may

25  file "a concise 'Statement of Disputed Facts,' and the source thereof in the record, of all
    additional material facts as to which there is a genuine issue precluding summary judgment."  Id.

26

1               ANALYSIS

2   I. Plaintiff's Constitutional Claims

3               Section 1983 of the Civil Rights Act provides that

4               [e]very person who, under color of [state law] . . . subjects, or
                causes to be subjected, any citizen of the United States or other
5               person within the jurisdiction thereof to the deprivation of any
                rights, privileges, or immunities secured by the Constitution and
6               laws, shall be liable to the party injured in an action at law, suit in
                equity, or other proper proceeding for redress.

7

8   42 U.S.C. § 1983.

9               In order to prevail on claims brought pursuant to § 1983, a plaintiff must prove

10  two essential elements:  (1) he was deprived of rights secured by the Constitution or laws of the

11  United States, and (2) each deprivation he suffered was committed by a person acting under color

12  of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

13      A.  Defendants' Involvement in the Deprivation of Plaintiff's Rights

14              Section 1983 requires that there be an actual connection or link between the

15  actions of the defendants and the deprivation alleged to have been suffered by the plaintiff.  See

16  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

17  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

18  meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

19  omits to perform an act which he is legally required to do that causes the deprivation of which

20  complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

21              Supervisory personnel may not be held liable under § 1983 for the actions of their

22  employees under a theory of respondeat superior.  Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir.

23  1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  A supervisory official may be

24  held liable if he or she was personally involved in a deprivation of the plaintiff's rights or if there

25  is a sufficient causal connection between the supervisor's wrongful conduct and the alleged

26  violation of rights.  Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991);

                                  13

1   Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir. 1989).  A causal connection may be established

2   by showing that a supervisor set in motion a series of acts by others which the supervisor knew or

3   reasonably should have known would cause others to inflict a constitutional violation.  Ybarra v.

4   Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984); Johnson, 588

5   F.2d at 743-44.

6          Plaintiff's second amended complaint alleges violations of  rights secured by

7   RLUIPA and the First and Fourteenth Amendments.  At screening, the undersigned found the

8   allegations of the pleading sufficient to link all defendants to the alleged deprivation of rights.

9   Having considered defendants' motion for summary judgment and plaintiff's opposition to it, the

10  undersigned finds that plaintiff has sued defendants Valdez and Knowles as the individuals who

11  created and implemented policies that caused the alleged deprivations.  Plaintiff has sued

12  defendant Alameida first for authorizing and approving institutional policies that caused the

13  alleged violations and second for denying plaintiff's inmate appeal, either personally or through

14  staff acting under his authority, thereby failing to ensure the constitutionality of prison policies.

15  The record reflects a sufficient causal connection between the conduct of these defendants and

16  the alleged violations of plaintiff's rights.  Plaintiff has sued defendant Woodford because the

17  injunctive relief he seeks may require action at the director's level if he prevails on his claims.

18         B.  Plaintiff's Constitutional Claims

19         "[P]risoners do not forfeit all constitutional protections by reason of their

20  conviction and confinement in prison."  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  An inmate

21  "retains those First Amendment rights that are not inconsistent with his status as a prisoner."

22  Pell v. Procunier, 417 U.S. 817, 822 (1974).  Among those rights is the directive that no law shall

23  prohibit the free exercise of religion.[3]  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).

24

25         [3]  The First Amendment, made applicable to the states by the Fourteenth Amendment,
    prohibits the making of laws "respecting an establishment of religion, or prohibiting the free
26  exercise thereof."  U.S. Const. amend. I.

A prisoner's First Amendment rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."  McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam). In particular, a prisoner's constitutional right to free exercise of religion must be balanced against the state's right to limit First Amendment freedoms in order to attain valid penological objectives such as rehabilitation of prisoners, deterrence of crime, and preservation of institutional security. Pell, 417 U.S. at 822-23.

The Supreme Court established the following standard for balancing prisoners' constitutional rights against legitimate correctional goals:  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89.  When an inmate challenges a prison regulation and prison officials seek to justify the regulation on the basis of a legitimate penological interest, the court must determine whether the regulation is reasonably related to the penological interest asserted.  Id.  In making such a determination, courts consider four factors:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and the governmental objective itself must be a legitimate and neutral one.  A second consideration is whether alternative means of exercising the right on which the regulation impinges remains open to prison inmates.  A third consideration is the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources.  Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at 89-91).  The Supreme Court has applied the Turner test in the context of prisoners' First Amendment rights. See O'Lone, 482 U.S. at 349-50.

Courts must, of course, accord deference to the decisions of prison administrators. Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 126 (1977).  "Nevertheless, deference does not mean abdication."  Walker v. Sumner, 917 F.2d 382, 385 (9th Cir. 1990).

15

1
2
3
4
5
6
7
8
9

> Prison officials must "put forward" a legitimate governmental
> interest to justify their regulation, <u>Turner v. Safley</u>, 482 U.S. at 89,
> and must provide *evidence* that the interest proffered is the reason
> why the regulation was adopted or enforced. <u>Swift v. Lewis</u>, 901
> F.2d 730, 732 (9th Cir. 1990) ("prison officials must at least
> produce some evidence that their policies are based on legitimate
> penological justifications"); <u>Caldwell v. Miller</u>, 790 F.2d 589, 598
> (7th Cir. 1986) ("the governmental interest asserted in support of a
> restrictive policy must be sufficiently articulated to allow for
> meaningful review of the regulation and its effect on the inmate's
> asserted rights"); <u>Wilson v. Schillinger</u>, 761 F.2d 921, 925 (3rd
> Cir. 1985), <u>cert. denied</u>, 475 U.S. 1096 (1986).  The Constitution
> requires that "considerations advanced to support a restrictive
> policy be directly implicated by the protected activity, and
> sufficiently articulated to permit constitutional review." <u>Caldwell</u>,
> 790 F.2d at 599.  It is only after prison officials have put forth such
> evidence that courts defer to the officials' judgment. <u>Id.</u> at 600.

10  <u>Id.</u> at 385-86 (parallel citations omitted) (emphasis in original).  Summary judgment must be

11  denied where prison officials fail to provide evidence that the interests they have asserted are the

12  actual bases for the regulation or policy under attack.  <u>Id.</u> at 386 (citing <u>Swift</u>, 901 F.2d at 731).

13  Prison officials cannot rely on conclusory assertions to support their policies but must first

14  identify the specific penological interests involved and then make an evidentiary showing that

15  those specific interests are the actual bases for their policies and that the policies are reasonably

16  related to the furtherance of the identified interests.  <u>Id.</u>

17          In the present case, plaintiff challenges institutional policies developed and

18  implemented in January and May 2002 and revised in May and December 2003.  Plaintiff claims

19  that these policies impinged and continue to impinge on his First Amendment right to free

20  exercise of religion.  In their motion for summary judgment, defendants argue that their purpose

21  was to protect the safety of inmates and staff from contraband, such as drugs and weapons, sent

22  into the prison from unknown and unapproved sources. Defendants further argue that prison

23  security is a legitimate penological interest and there is a valid and rational connection between

24  restricting unauthorized and unapproved religious publications and prison officials' legitimate

25  penological interest in prison security.  Defendants cite the policies themselves and the

26  declaration of Earl Kanipe, current litigation coordinator at MCSP.

1    The Kanipe declaration is silent as to the date on which declarant became the

2  litigation coordinator for MCSP and the length of declarant's employment at MCSP.  Declarant

3  does not state that he was involved in developing or implementing the policies at issue.

4  Declarant states only that he reviewed the policy in effect when plaintiff filed his inmate appeal

5  in 2003 and the policy in effect in January 2002, which declarant appears to believe is the policy

6  in effect when plaintiff's study guide was returned.[4]  Based solely on his review of the policies,

7  declarant asserts that the purpose of the policy in effect during the applicable period was to

8  eliminate the opportunity for an outside party to introduce contraband, such as drugs, into a

9  religious package.  Declarant admits that all packages are inspected upon receipt at the institution

10  and describes the pre-approval policy as "an added security measure."  None of the attachments

11  to the Kanipe Declaration contain a discussion of the purpose for the pre-approval policy or the

12  specific procedures implementing that policy.  While the November 19, 2002 memorandum

13  refers to "problems involving the processing of religious mail," no problems are described and

14  the use of the word "processing" does not lead to an inference that the problems involved

15  contraband.

16    Declarant Kanipe appears to lack personal knowledge of the reasons for and

17  objectives of any of the policies in effect in 2002 and 2003.  Declarant's review of some of the

18  policies in effect during those years is an insufficient basis for his assertion that the purpose of

19  the policies was to eliminate the opportunity for outside parties to introduce contraband into

20  packages containing religious materials.  The declarant's reference to drugs as an example of

21  contraband fails to support defendants' argument that mail containing religious publications,

22  unless pre-approved, presents a danger of containing drugs, weapons, and harmful items.

23  Declarant has not provided or cited any documentation gathered by prison officials to show that

24

25      [4]  The record does not establish either the date on which plaintiff sent his request for the
    study guide or the date on which it was returned.  The letter concerning the return of the study
    guide is dated February 20, 2003.  It appears to the undersigned that it was the May 2002 revision
26  rather than the January 2002 revision that was in effect when the study guide was returned.

1   institutional security mandated the pre-approval of all religious publications, including study

2   guides and pamphlets, and the complicated and burdensome procedures selected for

3   implementing the pre-approval policy.

4           The Kanipe declaration is not probative evidence that defendants' policies were

5   adopted in furtherance of a legitimate interest in security.  The individuals who developed and

6   implemented the policies, i.e., defendants Knowles and Valdez, have not offered their own

7   declarations to show that their policies were adopted in furtherance of such an interest.  Nor are

8   there declarations from defendants Alameida and Woodford concerning the need for such

9   policies and procedures at MCSP.  The reasonable inference is that the defendants are unable to

10  make the necessary showing in this regard.

11          Defendants have failed to put forth evidence that "added security measures" are

12  necessary with regard to religious publications when all packages are inspected on receipt at the

13  prison.  On the present record, defendants have not satisfied the first requirement of the Turner

14  test, as they have not shown a valid, rational connection between their policies and the legitimate

15  governmental interest put forward to justify them.

16          Nor have defendants shown that their objective was neutral.  Defendants argue

17  that the MCSP policies qualify as neutral because they do not ban any religious material but

18  merely ensure that the materials are sent from legitimate vendors pre-approved by prison

19  officials.  The Supreme Court has held that it is "'important to inquire whether prison regulations

20  restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the

21  content of the expression.'"  Thornburgh v. Abbott, 490 U.S. 401, 415 (1989) (quoting Turner,

22  482 U.S. at 90) (emphasis added).  In Thornburgh, the regulations at issue did not ban

23  publications because their content was religious, philosophical, political, social, or sexual, or

24  even because their content was unpopular or repugnant, but rather because the publications were

25  detrimental to security.  Id. at 415.  The Court explained that the prison officials were drawing

26  distinctions between publications "solely on the basis of their potential implications for prison

18

security" and were therefore neutral.  Id. at 415-16.  See also Jones v. North Carolina Prisoners'

Labor Union, Inc., 433 U.S. 119, 131 n.8 (1977) (upholding content distinctions between

materials that served a rehabilitative purpose and materials that posed a threat to the order and

security of the institution), cited in Thornburgh, 490 U.S. at 415 n.13.  The policies in the present

case apply solely to religious publications, distinguishing between religious publications and all

other publications.  Such a content-based distinction cannot be viewed as operating in a neutral

fashion with regard to content when defendants have not shown that only religious publications

have potential implications for prison security while other publications do not.

A regulation cannot be sustained where the logical connection between the

regulation and the asserted goal has not been demonstrated, and the legitimacy and neutrality of

the governmental objective has not been shown.  Turner, 482 U.S. at 89-90.  Because the first

Turner factor "'constitutes sine qua non,'" a court need not reach the remaining three factors if

the regulation at issue is not rationally related to a legitimate and neutral governmental objective.

Prison Legal News v. Lehman, 397 F.3d 692, 699 (9th Cir. 2005) (quoting Walker v. Sumner,

917 F.2d 382, 385 (9th Cir. 1990)).  While it is unnecessary to discuss the other Turner factors at

this time, the undersigned will address them briefly, as defendants may bring a second motion for

summary judgment at the close of discovery.

The second Turner factor requires the court to consider whether other avenues

remain available for exercising the asserted right.  Plaintiff has not demonstrated that other

avenues were unavailable.  The third consideration concerns the impact accommodation of the

asserted right will have on guards, other inmates, and the allocation of prison resources.  On this

point, defendants argue that "unfettered receipt of religious mail from outside sources would

have had a negative impact on other inmates and correctional staff."  They urge the court to defer

to prison administrators.  It does not appear that plaintiff seeks "unfettered receipt of religious

mail."  Moreover, defendants' subsequent revisions to their policies governing religious mail

suggest that accommodations of the asserted right were in fact possible without any negative

1   effect.  Defendants have not shown that a return to some or all of the procedures in effect in

2   January 2002 would have a negative impact on other inmates or correctional staff.  Plaintiff's

3   evidence suggest that such accommodation would have a positive impact on inmates and at least

4   some prison staff, particularly the chaplains.  With regard to the fourth factor, whether there was

5   a lack of ready alternatives, defendants argue that there were no obvious, easy alternatives to the

6   policies at issue.  Defendants speculate that plaintiff may suggest as one alternative that each

7   package be searched on receipt.  According to the Kanipe declaration, all packages are searched

8   and the pre-approval process is merely an "added" security measure.  The present record reflects

9   that an easy alternative in the form of a return to the pre-May 2002 policy was available, and

10   subsequent revisions support that conclusion.  An analysis of all four factors leads to the

11   conclusion that the policies in effect in 2002 and 2003 were not the least restrictive alternatives

12   available to prison officials.

13         Defendants have not carried their initial burden of pointing to evidence that there

14   is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of

15   law.  Defendants' motion for summary judgment on plaintiff's First Amendment claim should be

16   denied.[5]

17   II.  Plaintiff's Statutory Claims

18         "Section 3 of RLUIPA provides, in relevant part, that '[n]o government shall

19   impose a substantial burden on the religious exercise of a person residing in or confined to an

20   institution . . . even if the burden results from a rule of general applicability,' *unless* the

21   government establishes that the burden furthers 'a compelling governmental interest,' *and* does

22   so by 'the least restrictive means.'"  Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005)

23   (citing 42 U.S.C. § 2000cc-1(a)(1)-(2)) (emphasis in original).  For purposes of RLUIPA,

24

25       [5]  Defendants' motion does not address other constitutional claims, and defendants did

26   not file a reply to plaintiff's opposition, in which he argues that his due process and equal
    protection rights were also violated.

1   "religious exercise" includes "any exercise of religion, whether or not compelled by, or central

2   to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  The statute must be "construed in

3   favor of a broad protection of religious exercise, to the maximum extent permitted" by the Act

4   and the Constitution.  42 U.S.C. § 2000cc-3(g).  Individuals may assert a violation of RLUIPA as

5   a claim or defense in judicial proceedings and obtain appropriate relief.  42 U.S.C. § 2000cc-2(a).

6           RLUIPA is "the latest of long-running congressional efforts to accord religious

7   exercise heightened protection from government-imposed burdens."  Cutter v. Wilkinson, ___

8   U.S. ___, ___, 125 S. Ct. 2113, 2117 (2005) (holding that RLUIPA "does not, on its face, exceed

9   the limits of permissible government accommodation of religious practices").  In Cutter, the

10  Supreme Court noted that Congress enacted RLUIPA after documenting, "in hearings spanning

11  three years, that 'frivolous or arbitrary' barriers impeded institutionalized persons' religious

12  exercise."  Id. at 2118.  The Court found that the Act "alleviates exceptional government-created

13  burdens on private religious exercise" and "protects institutionalized persons who are unable

14  freely to attend to their religious needs and are therefore dependent on the government's

15  permission and accommodation for exercise of their religion."  Id. at 2121-22.  The Court noted

16  congressional anticipation "that courts entertaining complaints under § 3 would accord 'due

17  deference to the experience and expertise of prison and jail administrators.'"  Id. at 2119.

18          In the present case, the allegations of plaintiff's complaint and the evidence

19  produced by defendants demonstrate that the institutional policies at issue impeded plaintiff's

20  religious exercise in 2002 and 2003.  The policy in effect when plaintiff requested a study guide

21  for "Me and My Big Mouth" placed a substantial burden on inmates' ability to obtain and use

22  religious publications in their private religious exercise by (1) severely limiting the permissible

23  sources of religious publications, (2) restricting requests for publications to once per quarter, (3)

24  requiring inmates to obtain the approval of the inmate's chaplain and two prison officials, (4)

25  requiring inmates to complete two different forms, (5) imposing on inmates the task of ensuring

26  that religious organizations and publishers returned one of the required forms with the requested

1   publications, and (6) creating delay in the receipt of publications due to the complexity of the

2   approval process.  Subsequent revisions mitigated the burden only slightly.

3              Plaintiff has borne his initial burden of coming forward with evidence

4   demonstrating a prima facie claim that defendants' policies constituted a substantial burden on

5   his religious exercise.  See 42 U.S.C. § 2000cc-2(b); Warsoldier, 418 F.3d at 994-95.

6   Defendants' evidence, which the undersigned has found to be insufficient to establish even a

7   valid, rational connection between the challenged policies and a legitimate and neutral

8   governmental interest, fails to establish that the burden imposed on inmates at MCSP furthered a

9   compelling governmental interest and did so by the least restrictive means.  The court is unable

10  to defer to the experience and expertise of prison administrators at MCSP or of CDC directors

11  because there is no evidence on the record that such experience and expertise were brought to

12  bear on the matter of religious publications at MCSP.

13             Defendants have not borne their burden of showing that any substantial burden on

14  plaintiff's exercise of religious beliefs is both in furtherance of a compelling governmental

15  interest and the least restrictive means of furthering that compelling governmental interest.  See

16  42 U.S.C. § 2000cc-2(b); Warsoldier, 418 F.3d at 995.  Therefore, defendants' motion for

17  summary judgment on plaintiff's RLUIPA claim should be denied.

18  III.  Qualified Immunity

19             Defendants assert that they are entitled to qualified immunity from damages

20  because their conduct did not violate clearly established statutory or constitutional rights of

21  which a reasonable person would have known.  Defendants argue that there is no clearly

22  established law holding that procedures intended to control the introduction of contraband into a

23  prison by requiring inmates to obtain approval before requesting religious materials burden an

24  inmate's right to freely exercise his faith.  Defendants contend that plaintiff cannot demonstrate

25  that their procedures prevented him from engaging in conduct mandated by his faith.  Defendants

26  conclude that they could have reasonably believed that enforcement of the policies at issue was

1    reasonable because such enforcement did not substantially interfere with plaintiff's practice of

2    his religion.  Defendants point to the fact that plaintiff was still permitted to obtain religious

3    publications by following the approval procedure.

4              In response, plaintiff argues that defendants, without any evidence of a reasonably

5    related legitimate penological interest or objective, deliberately subjected his right to receive

6    religious mail to discriminatory treatment, first by amending the supplement to DOM § 53050 to

7    require special package labels, advance permission, and approved vendors for religious packages,

8    then by amending the supplement to apply the same restrictions to religious literature, and finally

9    by amending the supplement to return to the initial policy, removing restrictions that were never

10   placed on publications other than religious publications.  Plaintiff cites a Ninth Circuit decision

11   holding that a policy of requiring publications mailed to prisons to have an approved vendor label

12   was not rationally related to a legitimate penological objective where the prison still searched

13   every incoming package and was able to determine from the address label and invoice whether

14   the package came directly from a vendor.  Plaintiff notes that the Ninth Circuit found that the

15   defendants, whose policy applied to packages containing books and magazines but not to

16   packages containing appliances and clothing, were unable to explain why books and magazines

17   posed a more serious threat than other items.  Plaintiff argues that the defendants in this case

18   have not explained why religious books are any more susceptible to being used to deliver

19   contraband to prisoners than other types of books.  He concludes that such flagrantly content-

20   based restrictions violated clearly established rights and preclude qualified immunity.

21             "Government officials enjoy qualified immunity from civil damages unless their

22   conduct violates 'clearly established statutory or constitutional rights of which a reasonable

23   person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (per curiam)

24   (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The threshold question for a court

25   required to rule on a qualified immunity defense is whether the facts alleged, taken in the light

26   most favorable to the plaintiff, demonstrate that the defendants' conduct violated a statutory or

1  constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If no such right would have

2  been violated even if the plaintiff's allegations were established, "there is no necessity for further

3  inquiries concerning qualified immunity."  Id.

4       If a violation of a statutory or constitutional right is demonstrated by the plaintiff's

5  allegations, the court's next inquiry is "whether the right was clearly established."  Id.  This

6  inquiry must be undertaken in light of the specific context of the case.  Id.  In deciding whether

7  the plaintiff's rights were clearly established, "[t]he proper inquiry focuses on whether 'it would

8  be clear to a reasonable officer that his conduct was unlawful in the situation he confronted' . . .

9  or whether the state of the law in [the relevant year] gave 'fair warning' to the officials that their

10  conduct was unconstitutional."  Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (quoting

11  Saucier, 533 U.S. at 202, & citing Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 2511 (2002)).

12  Summary judgment based on qualified immunity is appropriate if the law did not put the

13  defendants on notice that their conduct would be unlawful.  533 U.S. at 202.  Because qualified

14  immunity is an affirmative defense, the burden of proof initially lies with the official asserting

15  the defense.  Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992);

16  Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

17       The court determined at screening that the facts alleged by plaintiff in his second

18  amended complaint, taken in the light most favorable to plaintiff, state cognizable claims upon

19  which relief may be granted.  The facts alleged by plaintiff concerning institutional policies

20  governing religious publications and mail at MCSP show that defendants violated plaintiff's

21  constitutional and statutory rights by imposing severe burdens and restrictions on religious mail

22  and literature.  Because plaintiff's allegations demonstrate violations of his rights, the court must

23  inquire whether those rights were clearly established in 2002.

24       It was clearly established in 2002 that prison inmates have a right to receive mail

25  and publications not prohibited by reasonable penological interests.  Thornburgh, 490 U.S. 401

26  (1989); Turner, 482 U.S. 78 (1987); Procunier, 416 U.S. 396 (1974); see also Prison Legal News

24

1   v. Cook, 238 F.3d 1145 (9th Cir. 2001); Walker v. Sumner, 917 F.2d 382 (9th Cir. 1990).  The

2   state of the law in 2002 gave fair warning to defendants that it would be unconstitutional to

3   implement a policy that violated inmates' right to receive religious mail and publications unless

4   the policy was reasonably related to a legitimate and neutral penological interest.  Defendants

5   have not shown that the policies they implemented at MCSP in 2002 and 2003 were reasonably

6   related to a legitimate and neutral penological interest.  It should have been clear to reasonable

7   prison officials in 2002 that their policies were not related to a legitimate and neutral penological

8   interest and would therefore violate inmates' rights.  On the present record, defendants are not

9   entitled to summary judgment on plaintiff's claims for money damages based upon any

10  entitlement to qualified immunity.

11          Accordingly, IT IS HEREBY RECOMMENDED that defendants' July 13, 2005

12  motion for summary judgment be denied.

13          These findings and recommendations are submitted to the United States District

14  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

15  after being served with these findings and recommendations, any party may file and serve written

16  objections with the court.  A document containing objections should be entitled "Objections to

17  Magistrate Judge's Findings and Recommendations."  Any reply to objections should be filed

18  and served within ten days after service of the objections.  The parties are advised that failure to

19  file objections within the specified time may waive the right to appeal the District Court's order.

20  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21  DATED: February 15, 2006.

22

23                                                      _____

24                                                      DALE A. DROZD
                                                        UNITED STATES MAGISTRATE JUDGE

25  DAD:13
    bess2498.57

26

                                                25