IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY BESS, JR.,

      Plaintiff,               No. CIV S-03-2498 GEB DAD P

    vs.

EDWARD S. ALAMEIDA, JR., et al.,    <u>ORDER AND</u>

      Defendants.           <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

      Plaintiff, a state prisoner confined at Mule Creek State Prison, is proceeding pro se with a civil rights action seeking relief under 42 U.S.C. § 1983.  The matter is before the court on defendants' second motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has filed an opposition to the motion.[1]  Defendants have filed a reply.  In addition, the court has granted Pacific Justice Institute leave to file an amicus curiae brief in support of plaintiff.  (Order filed June 29, 2007.)

---

[1] Plaintiff's opposition does not comply with Local Rule 56-260.  Plaintiff's typed opposition is comprised of a seven-page preliminary statement, a three-page chronology, a nine-page memorandum of points and authorities, extensive documentary evidence, and plaintiff's own declaration.  Plaintiff did not reproduce and admit or deny each fact itemized in defendants' statement of undisputed facts.  Nor did plaintiff present his own concise statement of disputed facts, as permitted, or the statement of undisputed facts required for a counter-motion for summary judgment.  Nevertheless, in the interests of justice, the court has read and considered plaintiff's opposition.

## PROCEDURAL HISTORY

On December 1, 2003, plaintiff filed a § 1983 complaint naming as defendants Edward Alameida, Jr., then director of the California Department of Corrections; Mike Knowles, then Warden of Mule Creek State Prison; and Mike Valdez, then Community Resources Manager at Mule Creek State Prison.  Plaintiff alleged that these defendants violated inmates' religious freedom by censoring religious mail and creating a substantial burden on inmates' exercise of religious freedom.  Plaintiff sought damages and injunctive relief.

Plaintiff's complaint was dismissed as so vague and conclusory that the court could not determine whether the allegations stated a cognizable claim for relief.  Plaintiff filed an amended complaint on April 21, 2004.  The court determined that the amended pleading stated cognizable claims against defendants Alameida, Knowles, and Valdez.  In response to the court's order requiring plaintiff to submit documents for service of process, plaintiff failed to submit a USM-285 form for one defendant, submitted a USM-285 form for an individual not named in the amended complaint, and did not submit true copies of the amended complaint.  The court construed plaintiff's submissions as an attempt to further amend his pleading.  Accordingly, plaintiff was granted leave to file a second amended complaint.

On July 15, 2004, plaintiff filed his second amended complaint, which is the operative pleading in this action.  The court determined that the second amended complaint stated cognizable claims against defendants Alameida, Knowles, and Valdez, as well as Jeanne Woodford, then the director of the California Department of Corrections.  Service was effected, and defendants filed an answer on February 28, 2005.  The court issued a discovery order on March 4, 2005.  Soon after the court directed the parties to file status reports, defendants filed their first motion for summary judgment.  Plaintiff filed an opposition.  Defendants did not file a reply.  The undersigned issued findings and recommendations on February 16, 2006, recommending that defendants' first motion for summary judgment be denied.  On March 22,

/////

1  2006, the assigned district judge adopted those findings and recommendations in full and

2  defendants' motion was denied.  Discovery, which had been previously stayed, ensued.

3               On January 25, 2007, defendants filed their second motion for summary

4  judgment.  Plaintiff has filed an opposition.  Defendants have filed a reply.  Pacific Justice

5  Institute has also filed an amicus curiae brief in support of plaintiff's opposition.

6  **PLAINTIFF'S CLAIMS**

7               In his second amended complaint, plaintiff makes the following allegations.  The

8  Mule Creek State Prison ("MCSP") Departmental Operations Manual ("DOM") § 53050, dated

9  February 1, 2002, was introduced by defendant Valdez, the Community Resources Manager.

10  The procedure announced therein was signed by defendant Knowles under the authorization of

11  defendant Alameida, who was the director of the California Department of Corrections ("CDC").

12  Under the announced procedure, mail room staff returned religious mail to the sender marked

13  "unauthorized," without notice to the inmate and in violation of an institutional memorandum,

14  the departmental operations manual and state regulations.  Plaintiff alleges that the challenged

15  procedure placed a substantial burden on inmates' religion and violated the First Amendment and

16  the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").

17               Plaintiff contends that the challenged procedure placed religious materials under

18  quarterly package restrictions for no reason other than to restrict religious practices.  He asserts

19  that the effect was to place a burden on religious materials that is not placed on secular materials.

20  For example, plaintiff alleges that under this procedure inmates could order any number of non-

21  religious books once every thirty days but were allowed to order only one religious book once

22  every ninety days.  Similarly, plaintiff alleges that under the challenged procedure a religious

23  calendar sent to an inmate was returned to the sender solely because the calendar was religious,

24  although secular calendars are permitted.  Finally, and most relevant to this action, plaintiff

25  alleges that Joyce Meyer Ministries sent him a publication titled "Me and My Big Mouth," but

26  prison mail room staff returned it to the sender, marking it "unauthorized."  Plaintiff learned of

3

1  the return only when he received a letter from Joyce Meyer Ministries.  Plaintiff also contends

2  that an inmate who wanted to order a religious book was required to obtain approval at three

3  levels while that was not required to obtain secular publications.

4          Plaintiff states that, although revisions have been made to the challenged

5  procedure in response to his claims, such recognition of the violation of his rights is not

6  sufficient.  Plaintiff seeks (1) a broad injunction prohibiting the imposition of severe burdens on

7  the exercise of religious by prisoners at MCSP; (2) an order directing mail room staff not to

8  separate mail into religious mail and regular mail and not to reject religious mail from approved

9  vendors merely because the particular item is not on the approved list; and (3) an order

10 prohibiting the CDC from censoring religious mail.  Plaintiff also seeks damages for his pain,

11 suffering, and mental anguish.

12         Although plaintiff's second amended complaint did not specifically cite the Due

13 Process Clause or the Equal Protection Clause of the Fourteenth Amendment, the court found

14 that the pro se pleading appeared to support such claims.  (Findings & Recommendations filed

15 Feb. 16, 2006 at 3.)

16                 **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

17         Summary judgment is appropriate when it is demonstrated that there exists "no

18 genuine issue as to any material fact and that the moving party is entitled to a judgment as a

19 matter of law."  Fed. R. Civ. P. 56(c).

20         Under summary judgment practice, the moving party

21         always bears the initial responsibility of informing the district court
           of the basis for its motion, and identifying those portions of "the
22         pleadings, depositions, answers to interrogatories, and admissions
           on file, together with the affidavits, if any," which it believes
23         demonstrate the absence of a genuine issue of material fact.

24 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

25 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

26 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

                                                4

1   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

2   after adequate time for discovery and upon motion, against a party who fails to make a showing

3   sufficient to establish the existence of an element essential to that party's case, and on which that

4   party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

5   concerning an essential element of the nonmoving party's case necessarily renders all other facts

6   immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

7   whatever is before the district court demonstrates that the standard for entry of summary

8   judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

9          If the moving party meets its initial responsibility, the burden then shifts to the

10  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

11  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

12  establish the existence of this factual dispute, the opposing party may not rely upon the

13  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

14  form of affidavits, and/or admissible discovery material, in support of its contention that the

15  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

16  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

17  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

18  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

19  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

20  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

21  1436 (9th Cir. 1987).

22         In the endeavor to establish the existence of a factual dispute, the opposing party

23  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

24  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

25  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

26  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

1   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

2   committee's note on 1963 amendments).

3          In resolving the summary judgment motion, the court examines the pleadings,

4   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

5   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

6   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

7   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

8   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

9   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

10  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

11  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

12  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

13  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

14  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

15         On December 22, 2004, the court advised plaintiff of the requirements for

16  opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

17  Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th

18  Cir. 1988).

19            **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND EVIDENCE**

20         Defendants summarize the case as follows: plaintiff, a Catholic, alleges that

21  prison officials' return of a non-denominational, self-help and motivational study guide entitled

22  "Me and My Big Mouth" to its sender violated his rights under the First Amendment, the

23  Religious Land Use and Institutional Persons Act of 2000 ("RLUIPA"), and the Fourteenth

24  Amendment Due Process and Equal Protection Clauses.  (Defs.' Mot. for Summ. J. at 6.)

25         Defendants' statement of undisputed facts is supported by citations to plaintiff's

26  deposition testimony, copies of his medical records, and declarations by M. Valdez, a

Community Resources Manager in the Division of Community Partnerships[2]; E. Kanipe, a

former litigation coordinator for MCSP; M. Knowles, former Warden at MCSP and current

Warden at Kern Valley State Prison[3]; R. Espinoza, Correctional Sergeant at MCSP; T. Kemp, a

MCSP mail room employee; S. Barham, Protestant Chaplain at MCSP; E. Alameida[4] and J.

Woodford, former Directors/Undersecretaries/Secretaries of the CDC and CDCR.  Defendants

have also submitted with their reply a declaration by Joe Cocke, the current litigation coordinator

at MCSP.

_____

[2]  Attached to the Valdez declaration are (1) copies of online shopping descriptions of "Me and My Big Mouth: Your Answer is Right Under Your Nose - Study Guide"; (2) Joyce Meyer Ministries' description of "Me and My Big Mouth Study Guide"; (3) a copy of the letter to plaintiff from Joyce Meyer Ministries, informing him that the study guide had been returned to them as UNAUTHORIZED; (4) the May 4, 1999 memorandum regarding procedure for purchases of religious artifacts; (5) MCSP DOM Supplement § 53050 May 2000 revision signed by defendant Knowles; (6) images of contraband, including religious claws and pins, sent through mail; (7) copies of "Criminon" self-help publication descriptions; (8) a copy of a notice sent to Mount Zion Bible Book Store, indicating concerns regarding religious packages sent to MCSP and a copy of Mount Zion Bible Church's response, indicating they would comply with the mail procedures; a copy of a notice sent to Kaufer's, indicating concerns regarding religious packages sent to MCSP and copy of Kaufer's response, indicating they would comply with the mail procedures; (9) MCSP DOM Supplement § 53050 May 2002 revision signed by defendant Knowles with copies of forms SP-R.1 and SP-R.2; (10) a copy of the November 19, 2002 memorandum sent to all inmates from defendant Knowles, explaining the MCSP DOM Supplement § 53050 May 2002 revision; (11) a copy of the religious special order tracking log; (12) MCSP DOM Supplement § 53050 May 2003 revision signed by defendant Knowles; and (13) plaintiff's relevant administrative grievances and responses thereto from the appeals office and the inmate appeals branch.

[3]  Attached to the Knowles declaration are (1) copies of online shopping descriptions of "Me and My Big Mouth: Your Answer is Right Under Your Nose - Study Guide"; (2) Joyce Meyer Ministries' description of "Me and My Big Mouth Study Guide"; (3) a copy of the letter to plaintiff from Joyce Meyer Ministries, informing him that the study guide had been returned to them as UNAUTHORIZED; (4) the May 4, 1999 memorandum regarding procedure for purchases of religious artifacts; (5) MCSP DOM Supplement § 53050 May 2000 revision signed by defendant Knowles; (6) images of contraband sent through mail; (7) copies of "Criminon" self-help publication descriptions; (8) MCSP DOM Supplement § 53050 May 2002 revision signed by defendant Knowles with copies of forms SP-R.1 and SP-R.2; (9) a copy of the November 19, 2002 memorandum sent to all inmates from defendant Knowles, explaining the MCSP DOM Supplement § 53050 May 2002 revision; (10) MCSP DOM Supplement § 53050 May 2003 revision signed by defendant Knowles; (11) MCSP DOM Supplement § 51020 April 2004 revision from Scott Kernan (regarding operational supplements).

[4]Attached to the Alameida declaration are copies of plaintiff's relevant appeals and responses thereto from the appeals office and inmate appeals branch.

1      The undersigned finds that defendants' evidence establishes the following facts:
2  Starting May 4, 1999, the procedure for inmates who wanted to purchase special religious items
3  and artifacts required an inmate to complete a "Religious Special Purchase Request" and a Trust
4  Withdrawal form and give them to the chapel clerk for their respective religion; the clerk would
5  forward the forms to the chaplain, and if approved, he would sign them and forward the forms to
6  the community resources manager (CRM) for review; if the CRM approved the forms, he would
7  forward them to Receiving and Release (R&R); R&R would then check the name of the inmate
8  against an approval list provided by the chaplain, according to the inmate's religion, and staff
9  would also check the list of approved vendors; if the request was approved, R&R would sign the
10  forms and forward them to the trust office; the trust office would then process the request
11  through normal institutional Special Purchase procedures.

12      In 2000-2001, contraband items found their way into the mail at MCSP; for
13  example, someone attempted to mail a packet of religious claw-like items; in addition, someone
14  attempted to mail into the prison tapestry needles; the items were sent into MCSP by way of
15  general mail and were intended for use in conjunction with some religious activity.

16      The mail room supervisor Villereal contacted defendant Valdez, then the CRM,
17  expressing concern about the volume of religious items, books, packages, and bulk mail flyers
18  that continued to stack up in the mail room and were not being processed in a timely manner.
19  Many of the items were sent unsolicited, while some were mailed because a family member
20  requested that they be sent to the inmate.

21      Defendant Valdez met with the chaplains and directed them to review and search
22  these items for contraband and asked that they be processed in a timely manner; Villereal
23  continued to express concerns about the volume of packages.

24      Warden Knowles contacted defendant Valdez and asked him to examine the
25  existing policy and recommend an amended policy to address security and staff concerns;
26  defendant Valdez reviewed general mail regulations and found that MCSP was not in compliance

1   with standard search procedures or acceptance of gift and donations by inmates; in addition, mail

2   room staff, chaplains, and custodial staff were not consistent in screening for contraband.

3          In 2000-2001, items from mainstream faith groups were scanned and processed

4   without delay, while items considered non-mainstream would be delayed or returned to the

5   vendor or sender; certain items of religious property received were supposed to be documented as

6   property on the inmate's property card.  However, this did not always take place, so inmates

7   could deny that items were theirs or claim that items were stolen by staff or other inmates.  These

8   issues created a less secure environment and staff required direction and policy in the area of

9   religious services.  Defendant Valdez's predecessor had previously sent a memorandum dated

10  October 24, 2001, requiring vendors to understand and acknowledge that no customers were

11  allowed to come into contact with the product before it was shipped to the prison.

12         The procedure for inmates obtaining special religious items and artifacts was

13  subsequently amended with MCSP DOM Supplement § 53050, May 2002 revision.  The change

14  helped ensure consistent security measures and communications in processing and inspection

15  upon receipt of a package at the institution and it clarified and identified a process for

16  participation for all religious correspondence.  The May 2002 revision also combined previous

17  fragmented policies into one approval process pursuant to which an inmate's request for special

18  religious purchases marked with SP-R1 (special purchase religious - 1) went through the

19  chaplain, then the CRM, and then the institution's R&R staff for approval before the inmate

20  ordered the item.  Once approved, the inmate would then complete the SP-R1 Form and send it

21  to the approved vendor with request for the approved item.  The vendor would then label the

22  package and place the vendor's stamp on the form before mailing it back to the inmate.

23         A November 19, 2002 memorandum was sent to all inmates at MCSP notifying

24  them of the updated procedures.  The memorandum informed inmates that, effective January 1,

25  2003, religious items, either sent at no charge or purchased from an approved vendor, would be

26  allowed once per quarter, per inmate; the memorandum was posted throughout the institution and

1   directed to chaplains, associate wardens, captains, and the entire inmate population.  Captains

2   employed the assistance of the Men's Advisory Committee to issue copies of the memorandums

3   to each inmate in their housing units as well as posting them in the housing unit.

4          In late 2002 or early 2003, plaintiff ordered a study guide entitled "Me and My

5   Big Mouth" from Joyce Meyer Ministries.[5]  Prison mail room officials at MCSP returned the

6   study guide to the sender because plaintiff had not sought prior approval for the publication as

7   required by prison policies and procedures.  Joyce Meyer Ministries sent plaintiff a letter,

8   notifying him that his request was not authorized.[6]

9          Under the May 2002 revision, prison officials were to notify an inmate if his

10  package was returned to the sender, stating the reason the package was rejected.  Defendant

11  Valdez has attempted unsuccessfully to locate a copy of the notice sent to plaintiff.  If plaintiff

12  did not receive a rejection notice, it was an oversight and not pursuant to the policy in effect at

13  the time since the policy was to provide inmates with notice if a package was returned.

14         During implementation of the May 2002 revision, Sergeant Campbell replaced

15  Villereal as mail room supervisor at MCSP.  Defendant Valdez met with Sergeant Campbell to

16  discuss the May 2002 revision.  In Sergeant Campbell's review of the procedure, she discovered

17  that the mail room staff and R&R staff were not consistent in notifying inmates of package

18  rejections.

19         Subsequently, the procedure was again amended with MCSP DOM Supplement §

20  53050, May 2003 revision which provided that special religious purchases would be authorized

21  once per month and could be obtained through approved vendors.  Inmates could request these

22

---

23         [5] Plaintiff reportedly already possessed the companion book.

24         [6] The record does not establish either the date on which plaintiff sent his request for the
    study guide or the date on which prison officials returned it to the sender.  The letter from Joyce
25  Meyer Ministries concerning the return of the study guide is dated February 20, 2003.  It appears
    to the undersigned that the May 2002 revision was in effect when prison mail room staff returned
26  the study guide to Joyce Meyer Ministries.

1   purchases through the special order form SP-1.  An inmate had to complete the form and have it

2   processed via the staff chaplain for approval.  If approved, the form would then be forwarded to

3   the R&R Sergeant for normal special order processing.  Religious items not available through

4   approved vendors could be acquired through the public faith community by seeking approval

5   from the CRM.  Such requests were generally approved.

6          Plaintiff filed an administrative grievance concerning the rejection of "Me and My

7   Big Mouth" and exhausted his appeal through the director's level.  Once plaintiff received notice

8   from Joyce Meyer Ministries that his request was not authorized, he could have submitted a

9   request as set forth in the November 19, 2002 memorandum and outlined above.  However,

10  plaintiff did not utilize the procedure with respect to the publication at issue here.

11          Currently, the process for obtaining special religious purchases is based on MCSP

12  DOM, Supplement § 53050, March 2006 revision pursuant to which religious items/artifacts are

13  authorized one per quarter in addition to inmates' personal property allotment.  Inmates may

14  obtain such items by using a special order form that the chaplains are authorized to approve.  If

15  the request is approved, the form is then sent to the R&R Sergeant who co-signs the form to

16  affirm that the vendor is authorized.  The R&R Sergeant then logs the request and returns the

17  original form to the facility chapel.  The chapel clerk then logs the request and returns the

18  original form to the inmate.  The inmate then may forward the form along with a completed trust

19  withdrawal slip to the trust office for processing.  If the request is denied, the decision is

20  presented immediately to the AWCS for review.  The denial form is then returned to the inmate

21  within 10 days.  Although boxes and packages continue to be processed by R&R, religious and

22  non-religious books are processed through the mail room like any other mail item.

23          Based on the evidence set forth above, defendants argue that they are entitled to

24  summary judgment as to all of plaintiff's claims because (1) defendants may not be sued in their

25  official capacities; (2) the predicate of the suit (the study guide) is a non-religious publication and

26  thus did not trigger First Amendment or RLUIPA protections; (3) defendant Woodford is not

11

1  personally liable or subject to retention for purposes of injunctive relief because she has resigned

2  as Secretary of CDCR; (4) defendants Woodford and Alameida are entitled to judgment as

3  administrators or supervisors of others; (5) the challenged policy was rationally related to

4  legitimate penological state interests; (6) no religious interest was burdened, and to the extent it

5  was, compelling governmental interests existed and the procedure employed was the least

6  restrictive means available; (7) the law and facts do not support plaintiff's due process or equal

7  protection claims; (8) defendants are entitled to qualified immunity from suit; and (9) plaintiff's

8  request for injunctive relief has been rendered moot.  (Defs.' Mot. for Summ. J. at 6.)

9                                                   **ANALYSIS**

10  **I.  Threshold Issues**

11          **A.  Characterization "Me and My Big Mouth"**

12          Defendants argue that they are entitled to summary judgment because "Me and

13  My Big Mouth" is a self-help publication, not a religious publication.  Defendants acknowledge

14  that the guide includes Bible verses, but emphasize that it is not a religious text; rather, it is

15  motivational and self-help in nature.  (Defs.' Mot. for Summ. J. at 7.)  Defendants note that

16  neither the Catholic priest nor the Protestant chaplain at MCSP referred plaintiff to the guide.

17  Defendants conclude that the court should not allow plaintiff to cloth his non-religious study

18  guide with RLUIPA and First Amendment protections.  (Id. at 8.)

19          In opposition, plaintiff argues that defendants are not entitled to summary

20  judgment because "Me and My Big Mouth" is a religious text.  It contains chapters entitled

21  "Learning to Speak God's Language" and "Become God's Mouthpiece."  Plaintiff contends that

22  any book that aids one in understanding the Bible is a religious text.  (Pl.'s Opp'n to Defs.' Mot.

23  for Summ. J. at 12-13.)

24          The undersigned finds that the proper characterization of "Me and My Big

25  Mouth" represents "a genuine issue of material fact."  Fed. R. Civ. P. 56(c).  Although

26  defendants may be correct that "Me and My Big Mouth" is a self-help publication, self-help

publications and religious publications are not necessarily mutually exclusive.  "Me and My Big

Mouth," for example, is written and sold by Joyce Meyer Ministries.  In fact, plaintiff sought the

publication from that ministry.  Although the study guide is also available through secular

vendors, such as MSN Shopping or Amazaon.com, the publication is found under Christianity or

religious and spirituality categories.  Finally, the fact that neither the Catholic priest nor the

Protestant chaplain referred plaintiff to the guide is not dispositive of the material issue.  The

chaplains may not have read the book or been familiar with it.  Accordingly, to the extent that

defendants' motion for summary judgment is based on the argument that the "Me and My Big

Mouth" is a non-religious publication, the motion should be denied.

### B.  Mootness of Plaintiff's Request for Injunctive Relief

Defendants argue that plaintiff's request for injunctive relief is moot because the

challenged regulations no longer offend plaintiff's interests.  (Defs.' Mot. for Summ. J. at 34-35.)

Defendants point to plaintiff's deposition, arguing that he admitted that the procedure for

processing requests for religious material has changed and no longer poses a problem requiring

injunctive relief.  Specifically, defendants rely on the following passages of that deposition:

> **Q.** But what's going on right now is fine.  You agree with it.  Is that correct?
>
> **A.** Yes
>
> **Q.** You like it.
>
> **A.** (Witness nods head.)
>
> **Q.** You like to be able to write, get your book through the mail; is that correct?
>
> **A.** Yes.

(Defs.' Ex. I at 139:15-24.)

> **Q.** Now, the Court said that you – in terms of your injunctive relief, and somewhat different than what you just read to me, said that you are seeking a broad injunction prohibiting severe religious burdens on Mule Creek, an order directing Mule Creek staff not to separate mail into religious mail and regular mail, and not to reject

1   religious mail from approved vendors just because a particular item
    is not on an approved list, and an order prohibiting CDCR from
2   censoring religious mail; is that correct?

3   **A.** Yes, sir.

4   **Q.** But, in fact, they are no longer censoring religious mail.  In fact,
    it's coming in.  It's being examined, of course.  And you don't
5   dispute or argue that's wrong, do you, examining?

6   **A.** I never did.

7   **Q.** All right.  And, in fact, religious mail can be sought and
    received now, and there's no burden, no interference with the mail;
8   is that correct?

9   **A.** Exactly.  And it should have never been.

10  (Defs.' Ex. I at 143:5-24.)

11          In opposition, plaintiff argues that "voluntary cessation of a challenged practice

12  does not deprive a federal court of its power to determine the legality of the practice.  (Pl.'s Opp'n

13  to Defs.' Mot. for Summ. J. at 18.)  Plaintiff contends that defendants have a heavy burden of

14  persuading the court that the challenged conduct is not reasonably expected to start up again.

15  Plaintiff concludes that defendants have not met their burden in this regard and therefore are not

16  entitled to summary judgment.  (Id. at 19.)

17          "Mootness is like standing, in that if it turns out that resolution of the issue

18  presented cannot really affect the plaintiff's rights, there is, generally speaking, no case or

19  controversy for the courts to adjudicate; no real relief can be awarded."  Smith v. Univ. of

20  Washington Law School, 233 F.3d 1188, 1193 (9th Cir. 2000). "Where the activities sought to be

21  enjoined already have occurred, and the . . . courts cannot undo what has already been done, the

22  action is moot, and must be dismissed."  Bernhardt v. County of Los Angeles, 279 F.3d 862, 871

23  (9th Cir. 2002).  See also Demery v. Arpaio, 378 F.3d 1020, 1025-26 (9th Cir. 2004) ("[A] suit for

24  injunctive relief is normally moot upon the termination of the conduct at issue[.]").  See David v.

25  Giurbino, 488 F. Supp. 2d 1048, 1056 (S.D. Cal. 2007).

26  /////

14

1    Here, plaintiff continues to seek injunctive relief as to a prison policy that has since

2    been modified to plaintiff's satisfaction.[7]  Plaintiff's claim for injunctive relief is therefore moot

3    unless it falls within the exception to the mootness doctrine.  The exception applies when "(1) the

4    challenged action was too short in duration to be fully litigated prior to its cessation or expiration;

5    and (2) there is a reasonable expectation that the same complaining party will be subjected to the

6    same action again."  First National Bank of Boston v. Bellotti, 435 U.S. 765, 774 (1978).  See also

7    Dilley v. Gunn, 64 F.3d 1365, 1368-69 (9th Cir. 1995) (prisoner's claim for adequate access to

8    law library was moot upon transfer and did not fall under the two-prong exception to mootness

9    doctrine); Wiggins v. Rushen 760 F.2d 1009 (9th Cir. 1985) (where prisoner was no longer

10   subjected to prison officials' allegedly unconstitutional activity, the complaint for injunctive relief

11   became moot); Williams v. Alioto, 549 F.2d 136, 143 (9th Cir. 1977) ("A mere speculative

12   possibility of repetition is not is not sufficient.  There must be a cognizable danger, a reasonable

13   expectation, of recurrence for the repetition branch of the mootness exception to be satisfied.");

14   1A C.J.S. Controversies Capable of Repetition Yet Evading Review § 82 (2007) (cases satisfying

15   the mootness exception include those actions involving issues such as abortion, elections,

16   residency requirements, benefits, and preadjudication detention).

17        Plaintiff has not demonstrated that his claim falls into the category of cases that

18   satisfy the "capable of repetition, yet evading review" exception.  Under the first prong of that

19   exception, a prisoner's claim that prison officials or prison policies burden or deny his right to

20   free exercise of religion is not a claim that will evade review.  First Amendment cases that are

21   properly filed are reviewed for cognizable claims and then decided by the federal courts.  Cf., e.g.,

22   Dilley, 64 F.3d at 1369 ("the scores of cases in which we have reviewed claims by inmates that

23   prison officials failed to provide adequate access to prison law libraries demonstrate that these

---

25   [7]   In relevant part, the governing policy states: "Religious organizations or publishers that
     send text material (non bound) pamphlets other than catalogs will be forwarded to the inmates as
26   regular mail. . . .  All religious mail will be processed via normal institutional policies for mail
     and is subject to search in keeping with CDCR policies."  (Defs.' Reply at 3.)

1   cases do not generally evade review.").  Under the second prong, plaintiff has not demonstrated a

2   reasonable expectation that prison officials will deny him access to his religious mail.  In fact,

3   after being denied "Me and My Big Mouth," plaintiff has since successfully availed himself of the

4   current process and obtained other religious publications.  (Defs.' Ex. J at 53:4-24.)  Plaintiff has

5   also conceded that the current procedures are constitutional.  (Id. at 81:5-17.)

6          In light of MCSP's new policy, and plaintiff's satisfaction with it, plaintiff's claim

7   for injunctive relief is now moot.  Plaintiff has not demonstrated that his claim is "capable of

8   repetition, yet evading review."  Accordingly, defendants' motion for summary judgment on

9   plaintiff's claim for injunctive should be granted.

10          **C.  Defendants' Involvement in the Deprivation of Plaintiff's Rights**

11                  1.  Defendant Woodford's Liability

12          Defendants argue that defendant Woodford is not personally liable, nor is she

13   subject to retention for purposes of injunctive relief because she has resigned as Secretary of

14   CDCR.  (Defs.' Mot. for Summ. J. at 9.)  Defendant Woodford's declaration states that she was

15   not the Secretary or Undersecretary of the CDCR, nor the Director of the CDC in late 2002 to

16   early 2003.  Her declaration further states that she resigned as the Acting Secretary on April 20,

17   2006.  (Woodford Decl. at 2.)  Plaintiff does not dispute these facts.

18          Previously, this court found that plaintiff had sued defendant Woodford because

19   the injunctive relief he sought might require action at the director's level if he prevailed on his

20   claims.  Given defendant Woodford's resignation, as well as this court's recommendation that

21   plaintiff's claim for injunctive relief be found moot, the court concludes that defendant Woodford

22   is entitled to summary judgment in her favor on plaintiff's claim for injunctive relief.

23                  2.  Supervisory Personnel

24          Defendants argue that defendants Woodford and Alameida are entitled to judgment

25   in their favor as mere administrators or supervisors of others and not subject to supervisorial

26   liability.  Defendants acknowledge that this court previously held that there was a "causal

1   connection between the conduct" of defendants Woodford and Alameida and plaintiff's alleged

2   deprivations.  However, defendants emphasize that the evidence now submitted with this motion

3   for summary judgment demonstrates that such a causal connection does not exist.  First,

4   defendants contend that neither Woodford nor Alameida committed any affirmative act,

5   participated in another's affirmative act, or failed to perform an act he or she was legally required

6   to perform.  In addition, defendants argue that plaintiff now admits that defendant Alameida did

7   not sign the director's level decision that denied plaintiff's administrative grievance against prison

8   officials for rejecting "Me and My Big Mouth."  Defendants argue that Alameida had no

9   knowledge of the administrative grievance and that plaintiff's attempt to hold Alameida liable is

10  based solely on his status as CDC Director at the time MCSP staff returned the publication to

11  Joyce Meyer Ministries.  (Defs.' Mot. for Summ. J. at 11.)  Finally, defendants argue that neither

12  Alameida nor Woodford wrote, read, participated in discussions relative to, or were otherwise

13  involved in the implementation of the challenged policy and procedure at MCSP.  (Defs.' Mot. for

14  Summ. J. at 12-13; Defs.' Reply at 4-5.)

15          In his opposition, plaintiff states that defendants Woodford and Alameida are not

16  entitled to summary judgment, arguing that the court has already found sufficient allegations in

17  the pleadings to link all defendants to the alleged deprivation of rights and contending that

18  defendants are not entitled to re-litigate the issue.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 13-

19  14.)

20          In this court's February 16, 2006 findings and recommendations recommending

21  denial of defendants' first motion for summary judgment, the court found that plaintiff had sued

22  defendant Alameida for authorizing and approving institutional policies that caused plaintiff's

23  alleged constitutional violations and for denying plaintiff's inmate appeal, either personally or

24  through staff acting under his authority, thereby failing to ensure the constitutionality of prison

25  policies.  The evidence submitted in connection with the pending motion indicates that defendant

26  Valdez, as the CRM, was responsible for reviewing and recommending updates to policies that

1   facilitate access for all interested inmates to religious programs.  The CRM does not have

2   authority to approve or order policy changes.  Only the warden possesses such authority.  CDCR

3   directors Woodford and Alameida were not involved in any way in changing MCSP policies.

4   Defendants' evidence also establishes that defendant Alameida did not sign, or have any

5   knowledge of, plaintiff's administrative grievance related to "Me and My Big Mouth."

6          As the court previously explained, supervisory personnel are generally not liable

7   under § 1983 for the actions of their employees under a theory of respondeat superior and,

8   therefore, when a named defendant holds a supervisorial position, the causal link between him and

9   the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d

10  858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442

11  U.S. 941 (1979).  Here, plaintiff has failed to tender any evidence in support of his contention that

12  a dispute exists as to a material issue of fact.  See Fed. R. Civ. P. 56(e).  The court finds that

13  plaintiff has failed to present any evidence establishing the involvement of defendants Alameida

14  or Woodford in approving or ordering policy changes or of defendant Alameida's involvement in

15  denying plaintiff's administrative appeal.  Accordingly, defendants Woodford and Alameida are

16  entitled to summary judgment in their favor.

17  **II. Plaintiff's Constitutional and Statutory Claims**

18          Defendants next argue that they are entitled to summary judgment on plaintiff's

19  claims brought pursuant to the First Amendment, RLUIPA and Due Process Equal Protection

20  Clauses.

21                    **A.  First Amendment**

22                        1.  Parties' Arguments

23          Defendants argue that the challenged policy did not violate plaintiff's First

24  Amendment free exercise rights because it was rationally related to legitimate penological state

25  interests.  Defendants contend that the threshold question is whether plaintiff's sincerely held

26  religious beliefs mean that without "Me and My Big Mouth," plaintiff was not able to worship or

                                        18

1   otherwise exercise his religious beliefs?  Defendants assert that the answer is no.  They argue that

2   plaintiff  concedes that he was able to practice his religion notwithstanding prison officials

3   returning his copy of "Me and My Big Mouth" to its sender.  In addition, defendants note that this

4   study guide is not a central element of plaintiff's Catholic religion.  (Defs.' Mot. for Summ. J. at

5   13-14.)

6          Defendants also argue that the challenged policy is valid under the principles

7   announced in Turner v. Safley, 482 U.S. 78 (1987).  In Turner, the Supreme Court established

8   guidelines governing constitutional challenges to prison regulations.  "[W]hen a prison regulation

9   impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to

10  legitimate penological interests."  Turner, 482 U.S. at 89.  The Supreme Court laid out a four-

11  factor test to determine the reasonableness of a prison regulation: (1) whether there is a valid,

12  rational connection between the regulation and the legitimate and neutral governmental interest

13  used to justify it; (2) whether there are alternative means of exercising the asserted prisoners'

14  right; (3) what impact accommodation of the asserted right will have on correctional staff and

15  other inmates, and on the allocation of prison resources in general; and (4) whether there are

16  obvious, easy alternatives to the regulation or policy in question, the absence of which is evidence

17  of the reasonableness of the prison rule.  Turner, 482 U.S. at 89-91.  (Defs.' Mot. for Summ. J. at

18  15.)

19          Under the first prong, defendants note that the policy in place before late 2002/

20  early 2003 was cumbersome, confusing, and presented security and workforce problems.  For

21  example, contraband items found their way into the prison.  As a result, defendants contend that

22  Warden Knowles asked CRM Valdez to examine the policy and recommend an amendment.  The

23  change ensured consistent security measures and communications and clarified the process for

24  religious correspondence.  (Defs.' Mot. for Summ. J. at 16.)  On November 19, 2002, a

25  memorandum was sent to all inmates, notifying them of the updated procedure.  Defendants

26  emphasize that both the Supreme Court and the Ninth Circuit have held that prison security is a

1    legitimate penological interest.  Moreover, defendants contend that effective and efficient

2    processing of mail falls squarely into that realm.  (Defs.' Mot. for Summ. J. at 17.)

3            Defendants also argue that the challenged policy was neutral.  (Id. at 17-18.)  The

4    regulation did not ban religious material.  It merely ensured that the vendor was one that has been

5    approved and the item was from a legitimate vendor.  Defendants contend that a regulation that

6    addresses religious material to the exclusion of non-religious material may nonetheless be deemed

7    neutral in operation.  Defendants argue that, in the prison context, regulations applicable to

8    specific types of content due to specific inherent risks or harms are considered content neutral.  In

9    defendants' view, there is no question that prison officials promulgated the regulation for the

10    security of the institution, not to suppress expression.  Defendants conclude that the challenged

11    regulation was rationally related to its objective of ensuring institutional security in the processing

12    of incoming mail.  (Id. at 18.)

13            Under the second prong of the Turner test, defendants argue that there were

14    alternative means of expression that remained open to plaintiff.  Defendants note that, once

15    plaintiff was informed that his study guide had been rejected, plaintiff had the opportunity to

16    submit a request as set out in the November 19, 2002 memorandum.  Instead, plaintiff chose to

17    file this lawsuit.  Defendants contend that the challenged policy did nothing to impinge on

18    plaintiff's practice of his religion and that he was able to pray, attend church and participate in

19    customary practices.  In fact, since the rejection of the study guide, plaintiff has availed himself of

20    the available process to obtain other religious publications.  (Id. at 20.)

21            Under the third prong, defendants note that, allowing plaintiff to receive the

22    package without compliance with the regulation, would have exposed staff and other prisoners to

23    substantial risk of harm associated with the introduction of contraband into prison.  The Supreme

24    Court has consistently held that prison administrators should be given wide-ranging deference in

25    the adoption and execution of policies needed to preserve the internal order and discipline of

26    institutional security.  (Defs.' Mot. for Summ. J. at 21.)

1    Finally, under the fourth prong of the <u>Turner</u> test, defendants contend that there

2    were no obvious, easy alternatives to the regulation at issue.  They argue that prison officials need

3    not eliminate every conceivable alternative method of accommodating plaintiff's constitutional

4    claim.  Rather, the burden is on plaintiff to demonstrate that there was an alternative way of fully

5    accommodating the prisoner's rights at a de minimis cost to valid penological interests.  If such an

6    alternative exists, the court may consider it as evidence that the challenged regulation does not

7    satisfy the reasonable relationship standard.  (Defs.' Mot. for Summ. J. at 21-22.)

8    In sum, defendants argue that their evidence shows that the challenged religious

9    publications policy was a constitutional prison regulation, serving a legitimate and neutral

10   objective of prison security.  They note that excluding contraband is important in maintaining

11   security, order, and discipline.  In addition, prison personnel may act more efficiently and

12   effectively in processing thousands of pieces of mail sent to prisoners each year.  Defendants

13   conclude by arguing that there is no objective evidence supporting plaintiff's assertion that the

14   study guide was an important component to either Christianity generally or to Catholicism

15   specifically.  Accordingly defendants assert that the challenged mail policy passes constitutional

16   muster under <u>Turner</u>, even though it is no longer applied.  (<u>Id.</u> at 22-23.)

17   In opposition to the motion for summary judgment, plaintiff argues that

18   defendants' policy was not rationally related to legitimate penological interests and that

19   defendants' claims that restricting Christian literature constitutes a rational penological interest is

20   exaggerated.  In addition, plaintiff contends, defendants' policy was not neutral in that it applied

21   solely to religious publications.  According to plaintiff, such a content-based distinction cannot be

22   viewed as operating in a neutral fashion.  Plaintiff concludes that the challenged policy is

23   unconstitutional under the Supreme Court's decision in <u>Turner</u>.  (Pl.'s Opp'n to Defs.' Mot. for

24   Summ. J. at 14-16.)

25   /////

26   /////

21

2. Discussion

A prisoner's First Amendment rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam).  In particular, a prisoner's constitutional right to free exercise of religion must be balanced against the state's right to limit First Amendment freedoms in order to attain valid penological objectives such as rehabilitation of prisoners, deterrence of crime, and preservation of institutional security. Pell, 417 U.S. at 822-23.

Courts must, of course, accord deference to the decisions of prison administrators. Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 126 (1977).  "Nevertheless, deference does not mean abdication."  Walker v. Sumner, 917 F.2d 382, 385 (9th Cir. 1990).

> Prison officials must "put forward" a legitimate governmental interest to justify their regulation, Turner v. Safley, 482 U.S. at 89, and must provide *evidence* that the interest proffered is the reason why the regulation was adopted or enforced.  Swift v. Lewis, 901 F.2d 730, 732 (9th Cir. 1990) ("prison officials must at least produce some evidence that their policies are based on legitimate penological justifications"); Caldwell v. Miller, 790 F.2d 589, 598 (7th Cir. 1986) ("the governmental interest asserted in support of a restrictive policy must be sufficiently articulated to allow for meaningful review of the regulation and its effect on the inmate's asserted rights"); Wilson v. Schillinger, 761 F.2d 921, 925 (3rd Cir. 1985), cert. denied, 475 U.S. 1096 (1986).  The Constitution requires that "considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to permit constitutional review."  Caldwell, 790 F.2d at 599.  It is only after prison officials have put forth such evidence that courts defer to the officials' judgment.  Id. at 600.

Id. at 385-86 (parallel citations omitted) (emphasis in original).  Summary judgment must be denied where prison officials fail to provide evidence that the interests they have asserted are the actual bases for the regulation or policy under attack.  Id. at 386 (citing Swift, 901 F.2d at 731).  Prison officials cannot rely on conclusory assertions to support their policies but must first identify the specific penological interests involved and then make an evidentiary showing that

/////

22

those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests.  Id.

Defendants' first purported justification for the challenged regulation is that it was necessary to prevent contraband from entering the prison.  Defendants do not contend that the religious literature is in and of itself a security concern.  Rather, defendants argue that, before prison officials implemented the challenged policy, many contraband items found their way into the mail at MCSP.  Defendants point to two instances involving contraband.  In one instance, someone attempted to send religious claw-like items through the mail.  In a second instance, someone attempted to mail a packet of tapestry needles into the prison.

However, defendants have failed to offer any evidence that contraband was more likely to be hidden in or disguised as religious mail, thereby justifying the pre-approval process for religious mail but not general mail.  Cf. Morrison v. Hall, 261 F.3d 896, 902 (9th Cir. 2001) ("although defendants have presented some evidence that contraband is sometimes included in bulk rate, third and fourth class mail, the defendants have failed to present any evidence that the risk of contraband in first or second class mail is any lower than the risk of contraband in mail that is sent bulk rate, third or fourth class."); Prison Legal News v. Cook, 238 F.3d 1145, 1150 (9th Cir. 2001) ("The Department has presented no evidence supporting a rational distinction between the risk of contraband in subscription non-profit organization standard mail and first class or periodicals mail.").

Aside from the two instances above, defendants are only able to proffer generalities regarding contraband.  For example, T. Kemp's declaration explains that "over the years," he has often found contraband – drugs, publications displaying frontal nudity and laminated religious book markers, which he contends could be used as knives.  However, T. Kemp does not specify whether his experience with contraband has been primarily with religious mail or general mail. He also does not specify whether his experience with contraband was any more or less of a problem prior to implementation of the challenged policy.  Similarly, S. Barham's declaration

1   states that "over the years" he has learned of instances where people have attempted to use

2   religious materials for the purpose of introducing contraband.  "Years ago" when he was a

3   correctional officer, he confiscated a Bible that was hollowed out and filled with drugs.  (Barham

4   Decl. at 2.)  Much like T. Kemp's declaration, Barham's declaration is silent as to when these

5   incidents occurred.  Finally, R. Espinoza's declaration notes that "[y]ears ago" a family member

6   sent notes to an inmate hidden in a religious book.  The notes were considered contraband because

7   they must be written and mailed through first class mail.  Again, R. Espinoza's declaration does

8   not demonstrate that his experience with contraband is relevant because it may have occurred after

9   prison officials adopted the challenged policy.  In fact, Espinoza's declaration points to an

10  instance in the first part of 2006, after the challenged policy was implemented, when marijuana

11  had been found in incoming mail.  However, he was unable to recall whether the mail was

12  classified as religious mail or regular mail.  Espinoza also declares that, in his experience,

13  contraband has been sent to the prison in regular mail and packages as well as in religious mail.

14  (Espinoza Decl. at 3.)

15          On average, MCSP receives an estimated 3000 to 4500 pieces of mail a day and

16  1300 pieces of property per month.[8]  However, aside from the two instances mentioned above,

17  defendants have not otherwise been able to support their claim that institutional security mandated

18  the pre-approval of all religious publications and the complicated and burdensome procedures

19  selected for implementing the pre-approval policy, particularly when all packages are inspected on

20  receipt at the prison.  Defendants' security justification does not satisfy the first prong of the

21  /////

22

---

23          [8]  T. Kemp, an MCSP mail room employee, declares that he is responsible for processing
     mail for one-third of inmates.  On average, he processes from 1000 to 1500 pieces of mail each
24  day.  He speculates that other mail room staff process similar amounts.  Although those numbers
     have increased a bit since 2002-2003, Kemp declares that the numbers remain similar.  (T. Kemp
25  Decl. at 3.)  R. Espinoza, MCSP's R&R supervisor, declares that R&R processes on average an
     estimated 1300 pieces of property per month.  Based on his experience, he estimates that the
26  pieces of property processed in late 2002 or early 2003 was similar to that number.

1   Turner test, as defendants have not demonstrated a valid, rational connection between their

2   policies and the legitimate governmental interest put forward to justify them.

3          Defendants' other purported justification for the challenged regulation is that it was

4   necessary to process incoming mail more efficiently and effectively.  However, the Ninth Circuit

5   has rejected the efficient use of prison resources as a justification for impinging on prisoners' First

6   Amendment rights.  See Morrison v. Hall, 261 F.3d 896 (9th Cir. 2001); see also Prison Legal

7   News v. Cook, 238 F.3d 1145, 1151 (9th Cir. 2001).

8          In Morrison, an Oregon prisoner had a pre-paid subscription to Montana Outdoors,

9   a for-profit subscription magazine, typically mailed bulk rate, third, or fourth class mail.  The

10  prison mail room staff returned the magazine to the publisher, inaccurately stating that the address

11  was incorrect.  The prisoner challenged the prison regulation, prohibiting prisoners from receiving

12  bulk rate, third, or fourth class mail.  In a motion for summary judgment, defendants claimed,

13  inter alia, that the regulation facilitated the efficient use of prison personnel and prison resources.

14  Morrison, 261 F.3d at 902.  The defendants had submitted a declaration by the Deputy Assistant

15  Director of the Oregon Department of Corrections, stating that Oregon prisons received massive

16  volumes of bulk rate, third, and fourth class mail, and approximately one quarter of a staff

17  person's time had been taken each day dealing with unsolicited and non-privileged junk mail.  Id.

18  at 903.  In addition, the declaration emphasized that mail room staff had to spend significant time

19  scanning pages in an effort to prevent contraband from entering the institution.  Finally, the

20  declaration stated that, because the catalogues and brochures often contained contraband, and

21  inmates were entitled to a hearing each time contraband was confiscated by mail room staff, a

22  policy prohibiting bulk rate, third, and fourth class mail reduced confiscation hearings.  Id. at 903.

23         The Ninth Circuit held that efficient use of staff time does not justify a ban on bulk

24  rate, third, and fourth class mail.  Morrison, 261 F.3d at 903.  The court also found that, despite

25  the Deputy Assistant Director's declaration, "defendants have failed to submit any evidence

26  regarding the quantum of for-profit subscription publications received at Oregon prisons."  Id. at

903.  The court explained that the declaration only contained statistics related to "unsolicited and

non-privileged junk mail."  <u>Id.</u> at 903.

In this case, defendant Valdez describes the volume of religious mail at MCSP as

follows:

> I was contacted by mail room supervisor Villereal, who expressed
> concern for the volume of religious items, books, packages, bulk
> mail flyers that continued to stack up in the mail room and were not
> being processed into the prison in a timely manner.  <u>Many of these
> items were being sent to the prison without being sought by the
> inmate.  Some were being sent to inmates because a family member
> asked that the item be sent.  In other instances, they were unsolicited
> material from religious organizations.</u>  (emphasis added)
>
> I met with the chaplains and directed them to review and search
> these items for contraband and asked that they be processed into the
> institution in a timely manner.  I personally spent on average one
> day out of very work week reviewing and searching the non-general
> mail items being sent to the prison.  <u>These items often included bulk
> mailed pamphlets and catalogs, and cassette tapes and videos that
> had not been requested by the inmate.</u>  (emphasis added)
>
> Villereal continued to report his concerns about the volume of
> religious packages to the central services captain and warden.  The
> volume of these items were simply beyond the resources of myself
> and the chaplains to keep up with.  I would estimate that 1 cubic
> yard of religious items were being received by MCSP each week.

(Valdez Decl. at 4-5.)  As in <u>Morrison</u>, defendants here have not submitted any probative

evidence that processing <u>solicited</u> religious mail, such as "Me and My Big Mouth" has a

burdensome impact on MCSP staff.  Defendants have therefore failed to demonstrate that

processing incoming mail more efficiently and effectively mandated the pre-approval of all

religious publications and the complicated and burdensome procedures selected for implementing

the pre-approval policy.

Defendants have also failed to show that their objective was neutral.  Defendants

attempt to claim that the challenged policy was promulgated not to suppress expression, but for

neutral purposes, including security of the institution and efficient and effective processing of

incoming mail.  As discussed above, it is "'important to inquire whether prison regulations

1  restricting inmates' First Amendment rights operated in a neutral fashion, <u>without regard to the</u>

2  <u>content of the expression.</u>'" <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 415 (1989) (quoting <u>Turner</u>,

3  482 U.S. at 90) (emphasis added).  In <u>Thornburgh</u>, the regulations at issue did not ban

4  publications because their content was religious, philosophical, political, social, or sexual, or even

5  because their content was unpopular or repugnant, but rather because the publications were

6  detrimental to security.  <u>Id.</u> at 415.  The Supreme Court explained in <u>Thornburgh</u> that the prison

7  officials were drawing distinctions between publications "solely on the basis of their potential

8  implications for prison security" and were therefore neutral.  <u>Id.</u> at 415-16.  <u>See</u> <u>also</u> <u>Jones v.</u>

9  <u>North Carolina Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 131 n.8 (1977) (upholding content

10  distinctions between materials that served a rehabilitative purpose and materials that posed a

11  threat to the order and security of the institution).

12      In contrast, the challenged policy at MCSP applied solely to religious publications,

13  distinguishing between religious publications and all other publications.  Such a content-based

14  distinction cannot be viewed as operating in a neutral fashion with regard to content, particularly

15  when defendants have not shown that only religious publications have potential implications for

16  prison security and efficiency while other publications do not.

17      Because the first <u>Turner</u> factor "'constitutes <u>sine</u> <u>qua</u> <u>non</u>,'" a court need not reach

18  the remaining three factors if the regulation at issue is not rationally related to a legitimate and

19  neutral governmental objective.  <u>Prison Legal News v. Lehman</u>, 397 F.3d 692, 699 (9th Cir. 2005)

20  (quoting <u>Walker v. Sumner</u>, 917 F.2d 382, 385 (9th Cir. 1990)).  Nonetheless, below the

21  undersigned will briefly address the other <u>Turner</u> factors.

22      The second <u>Turner</u> factor requires the court to consider whether other avenues

23  remain available for exercising the asserted right.  Plaintiff has not demonstrated that other

24  avenues were unavailable to him.

25      The third <u>Turner</u> factor concerns the impact accommodation of the asserted right

26  will have on guards, other inmates, and the allocation of prison resources.  On this point,

1  defendants argue that "[p]ermitting plaintiff to receive the package without compliance with the

2  regulation would have exposed staff and other prisoners to a substantial risk of harm associated

3  with the introduction of contraband into the prison." (Defs.' Mot. for Summ. J. at 21.)  They urge

4  the court to defer to prison administrators in this regard.  However, defendants' evidence of

5  contraband entering the prison in religious mail can be fairly characterized as limited at best.

6  They point to only two such instances occurring during the relevant time period.  Based on this

7  showing, the court concludes that defendants' stated concern of a "substantial risk of harm" is

8  exaggerated.  Moreover, defendants' subsequent revisions of their policy governing religious mail

9  suggest that accommodations of the asserted right were in fact possible without any negative

10  effect.

11           The fourth <u>Turner</u> factor assesses whether there was a lack of ready alternatives.

12  Defendants argue that there were no obvious, easy alternatives to the policies at issue.  Defendants

13  speculate that plaintiff may suggest as one alternative that each package be searched on receipt.

14  Defendants contend, however, that prison officials are not obligated to pick and choose between

15  security measures or to employ only the most minimal measures available.  As the court already

16  determined above, the pre-approval process for the mailing of religious materials appears to be an

17  exaggerated response to defendants' security concerns.  Moreover, the present record reflects that

18  a number of easy alternatives were available to prison officials as evidenced by the subsequent

19  revisions to the process.  The court therefore concludes that the policy in effect at the time prison

20  staff returned to the sender the copy of "Me and My Big Mouth" addressed to plaintiff were not

21  the least restrictive alternatives available to prison officials.

22           In sum, defendants have not carried their burden and their motion for summary

23  judgment on plaintiff's First Amendment claim should therefore be denied.

24  /////

25  /////

26  /////

**B.  Religious Land Use and Institutionalized Persons Act**

1.  <u>Parties' Arguments</u>

Defendants first argue that they are entitled to summary judgment because RLUIPA does not allow damages suits against defendants in their individual capacity. (Defs.' Mot. for Summ. J. at 23-24.)  Defendants also argue that the challenged regulation did not substantially burden plaintiff's exercise of his religion, and to the extent that it did, the regulation advanced a compelling governmental interest and was the least restrictive means of furthering that compelling interest.  (Defs.' Mot. for Summ. J. at 24.)

In this regard, defendants argue that plaintiff's exercise of religion was not substantially burdened because the challenged regulation was neither "oppressive to a significantly great extent" nor did it impose a "significantly great restriction or onus upon [religious] exercise."  (<u>Id.</u>)  Defendants argue that the Supreme Court has found a substantial burden only where the state places a substantial pressure on an adherent to modify his behavior and violate his beliefs.  Here, defendants contend, the challenged policy did not prevent plaintiff from practicing his religion in the slightest.  In this regard, defendants note that plaintiff conceded that the rejection of his copy of "Me and My Big Mouth" was an isolated incident and that he has successfully ordered religious items both prior to and after the isolated incident.  Defendants also argue that the challenged policy did not prevent plaintiff from acquiring the study guide in question but only required that he follow the established procedure to ensure that the publication was being sought from a valid vendor and was not reasonably expected to contain contraband. Defendants argue that the policy did not affect plaintiff's ability to practice religion or prevent him from being a practicing Catholic.  (<u>Id.</u> at 24-25.)

Next, defendants argue that, even assuming the challenged policy constituted a substantial burden, there were compelling state interests at stake and the regulation was the least restrictive means of furthering those interests.  (<u>Id.</u> at 27.)  In this vein, defendants contend that prison officials have a valid interest in preventing contraband from entering the prison and in

1   ensuring the effective and efficient processing of prison mail.  Defendants argue that the Supreme

2   Court has recognized that Congress enacted RLUIPA with the expectation that courts would apply

3   the compelling government interest standard with due deference to the experience and expertise of

4   prison administrators in establishing necessary regulations and procedures to maintain good order.

5   Cutter v. Wilkinson, 544 U.S. at 722-23.  According to defendants, the decision of the Court in

6   Cutter stands for the proposition that the compelling state interest/least restrictive means test

7   adopted under RLUIPA is equivalent to, and in application should require the same results as, the

8   reasonable relationship to legitimate penological interest standard under Turner.  (Defs.' Mot. for

9   Summ. J. at 27-28.)

10            Plaintiff responds that defendants' challenged policy violated RLUIPA.  Plaintiff

11   sought material to exercise his faith and required supplemental materials to help him understand

12   the Bible.  Defendants' policy, disallowing free religious study materials, substantially burdened

13   plaintiff and prevented him from engaging in conduct both important to him and motivated by

14   sincerely held religious beliefs.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 17.)

15                    2.  Discussion

16            As the Ninth Circuit has observed:

17            Section 3 of RLUIPA provides, in relevant part, that "[n]o
            government shall impose a substantial burden on the religious
18            exercise of a person residing in or confined to an institution . . .
            even if the burden results from a rule of general applicability,"
19            *unless* the government establishes that the burden furthers "a
            compelling governmental interest," *and* does so by "the least
20            restrictive means."

21   Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-1(a)(1)-

22   (2)) (emphasis in original).  For purposes of RLUIPA, "religious exercise" includes "any exercise

23   of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. §

24   2000cc-5(7)(A).  The statute must be "construed in favor of a broad protection of religious

25   exercise, to the maximum extent permitted" by the Act and the Constitution.  42 U.S.C. § 2000cc-

26   3(g).

1    RLUIPA is "the latest of long-running congressional efforts to accord religious

2  exercise heightened protection from government-imposed burdens."  Cutter v. Wilkinson, 544

3  U.S. 709, 714 (2005) (holding that RLUIPA "does not, on its face, exceed the limits of

4  permissible government accommodation of religious practices").  In Cutter, the Supreme Court

5  noted that Congress enacted RLUIPA after documenting, "in hearings spanning three years, that

6  'frivolous or arbitrary' barriers impeded institutionalized persons' religious exercise."  Id. at 2118.

7  The Court found that the Act "alleviates exceptional government-created burdens on private

8  religious exercise" and "protects institutionalized persons who are unable freely to attend to their

9  religious needs and are therefore dependent on the government's permission and accommodation

10  for exercise of their religion."  Id. at 2121-22.  The Court noted congressional anticipation "that

11  courts entertaining complaints under § 3 would accord 'due deference to the experience and

12  expertise of prison and jail administrators.'"  Id. at 2119.

13    No federal courts of appeal have ruled on whether RLUIPA allows damages

14  against state officials sued in their individual capacities, and federal district courts are split on the

15  question.  Compare Shidler v. Moore, 409 F. Supp. 2d 1060, 1071 (N.D. Ind. 2006) (recognizing

16  RLUIPA claim for damages); Charles v. Verhagen, 220 F. Supp. 2d 937, 953 (W.D. Wis. 2002)

17  (same); and Guru Nanak Sikh Society of Yuba City v. Sutter, 326 F. Supp. 2d 1128, 1136 (E.D.

18  Cal. 2003) ("government" in RLUIPA includes officials, so actions are permitted against them at

19  least in their official capacities"); with Boles v. Neet 402 F. Supp. 2d 1237, 1241 (D. Colo. 2005)

20  (damages are not available under RLUIPA).

21    RLUIPA's provision authorizing a cause of action states: "A person may assert a

22  violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief

23  against a government."  42 U.S.C.A. § 2000cc-2(a).  However, the Act defines "government" to

24  include:

25  /////

26  /////

1           (i)  a State, county, municipality, or other governmental entity
2    created under the authority of a State;

       (ii) any branch, department, agency, instrumentality, or official of an
3    entity listed in clause (i); and

4           (iii) any other person acting under color of State law. . . .

5    42 U.S.C.A. § 2000cc-5(4)(A).

6           As several courts have recognized in unpublished opinions, if Congress had not

7    added subsection (iii), RLUIPA would only contemplate claims against officials in their official

8    capacity.  However, by including language that tracks that found in 42 U.S.C. § 1983, Congress

9    appears to have intended RLUIPA to authorize claims against all persons amenable to suit under §

10   1983.  See, e.g., Daker v. Ferrero, No. 1:03-CV-02481-RWS, 2006 WL 346440 at *9-10 (N.D.

11   Ga. Feb. 13, 2006); Agrawal v. Briley, No 02-C-6807, 2006 WL 3523750 at *9-13 (N.D. Ill. Dec.

12   6, 2006) (and cases cited therein);  see also Jama v. U.S. Immigration and Naturalization Serv.,

13   343 F. Supp.2d 338, 374 (D. N.J. 2004) (interpreting RLUIPA's predecessor statute, RFRA).

14   RLUIPA provides that claimants may obtain "appropriate relief."  Although the provision does

15   not expressly state that monetary damages are available, it also does not preclude them.

16   Accordingly, this court concludes that plaintiff may proceed on his RLUIPA claims for monetary

17   damages against defendants in their individual capacities.

18          As the court explained in its February 16, 2006 findings and recommendations

19   recommending that defendants' first motion for summary judgment be denied, the allegations of

20   plaintiff's complaint and the evidence produced by defendants demonstrate that the institutional

21   policies at issue impeded plaintiff's religious exercise in late 2002 or early 2003.  When plaintiff

22   requested "Me and My Big Mouth," MCSP's policy placed a substantial burden on prisoners'

23   ability to obtain and use religious publications in their private religious exercise by (1) severely

24   limiting the permissible sources of religious publications; (2) restricting requests for publications

25   to once per quarter; (3) requiring inmates to obtain the approval of the inmate's chaplain and two

26   prison officials; (4) requiring inmates to complete two different forms; (5) imposing on inmates

the task of ensuring that religious organizations and publishers returned one of the required forms with the requested publications; and (6) creating delay in the receipt of publications due to the complexity of the approval process.

Plaintiff has carried his initial burden of coming forward with evidence demonstrating a prima facie claim that the challenged policy constituted a substantial burden on his religious exercise.  See 42 U.S.C. § 2000cc-2(b); Warsoldier, 418 F.3d at 994-95. Defendants' evidence, which the undersigned has again found to be insufficient to establish even a rational connection between the challenged policy and a legitimate and neutral governmental interest, fails to establish that the burden imposed on prisoners at MCSP furthered a compelling governmental interest and did so by the least restrictive means.  The court is unable to defer to the experience and expertise of MCSP administrators or CDCR directors, as the defendants argue, because there is no evidence on the record that such experience and expertise was brought to bear on the matter of religious publications at MCSP.

Defendants have not borne their burden of showing that any substantial burden on plaintiff's exercise of religious beliefs is both in furtherance of a compelling governmental interest and the least restrictive means of furthering that compelling governmental interest.  See 42 U.S.C. § 2000cc-2(b); Warsoldier, 418 F.3d at 995.  Accordingly, defendants' motion for summary judgment on plaintiff's RLUIPA claim should be denied.

### C. Due Process Clause

#### 1. Parties' Arguments

Defendants argue that the law and facts do not support plaintiff's due process claim.  Relying on the decision in Sorrels v. McKee, 290 F.3d 965 (9th Cir. 2002), defendants contend that prison officials' negligence in failing to provide plaintiff with notice that they returned "Me and My Big Mouth" to the sender is not actionable as a due process violation under § 1983.  (Defs.' Mot. for Summ. J. at 28-29.)  In this regard, defendants argue that the procedures then in place required prison officials to notify plaintiff that they had returned the publication to

1    the sender.  They contend that prison officials' failure to send plaintiff such a notice was at worst,

2    negligent.  (Id. at 29.)  Plaintiff has not disputed defendants' contentions in this regard.

3                                        2.  Discussion

4               The court is persuaded by defendants' argument on this point.  In Sorrels, a

5    prisoner brought a § 1983 action against prison officials, claiming that they violated his due

6    process rights when they failed to notify him that they rejected a gift copy of the Georgetown Law

7    Journal sent to him by an attorney.  290 F.3d at 968.  The Ninth Circuit concluded that prisoners

8    have a Fourteenth Amendment due process liberty interest in receiving notice if prison officials

9    withhold from them incoming mail.  Sorrel, 290 F.3d at 972.[9]  The court  explained, however, that

10   while the deprivation of such rights caused by conduct engaged in pursuant to established state

11   procedure would be cognizable, "mere negligence on the part of prison officials is not actionable

12   as a due process violation under § 1983."  Id.  See also Frost v. Symington, 197 F.3d 348, 353-54

13   (9th Cir. 1999) (prisoner has due process interest in receiving notice of items being withheld).

14   There, the court concluded that the prison officials' failure to notify Sorrel constituted at most

15   negligence, and therefore did not state a cognizable due process claim under § 1983.  Sorrel, 290

16   F.3d at 972-73.

17              The same is true here.  The evidence submitted by defendants in support of their

18   motion for summary judgment demonstrates that prison officials' failure to notify plaintiff that

19   they were rejecting "Me and My Big Mouth" was the result of negligence, and not pursuant to

20   established policy.  In fact, established policy in effect at the time provided that the same notice

21   procedures applicable with respect to standard mail and package would be followed for religious

22   mail and package rejections.  Under that policy, plaintiff should have received a rejection notice.

23   Accordingly, because the failure to provide the required rejection notice was a result of negligence

24

25              [9]  It should be noted that it was prison officials' failure to provide plaintiff with notice
     that they rejected the journal that stated the due process claim found to be cognizable, not their
26   actual rejection of the law journal.  Sorrels v. McKee, 290 F.3d 965, 972 (9th Cir. 2002).

1   and not pursuant to policy, defendants are entitled to summary judgment in their favor on

2   plaintiff's due process claim.

3              **D.  Equal Protection Clause**

4                   1.  Parties' Arguments

5              Defendants argue that the law and facts also do not support plaintiff's equal

6   protection claim.  Relying on the decision in Washington v. Davis, 426 U.S. 229, 239-40 (1976),

7   they contend that for plaintiff to prevail on a § 1983 claim based on a violation of the Equal

8   Protection Clause, he must show that defendants intentionally discriminated against him or

9   against a class of inmates which included plaintiff.  Defendants acknowledge that prison officials

10  must give inmates who adhere to a minority religion a reasonable opportunity of pursing their

11  faith, but emphasize that prison facilities do not need to provide identical facilities or

12  accommodations to people of different faiths.  Defendants first note that plaintiff's religion,

13  Catholicism, is not a minority religion.  (Defs.' Mot. for Summ. J. at 30.)  They contend that the

14  challenged regulation applied to all prisoners, not just plaintiff.  Defendants argue that plaintiff

15  has presented no evidence that his practice of religion was dealt with any differently than that of

16  other inmates.  (Id. at 31.)

17             In opposition, plaintiff argues that he has in fact demonstrated that he was treated

18  differently than similarly situated inmates.  Specifically, plaintiff claims that he has shown that

19  secular texts were not restricted in number while religious texts were.  Plaintiff also contends that

20  on its face the challenged policy is evidence of an intent to discriminate.  (Id. at 18.)

21                   2.  Discussion

22             Equal protection is relevant with respect to classifications that impermissibly

23  operate to disadvantage a suspect class or improperly interfere with an individual's exercise of a

24  fundamental right.  Fourteenth Amendment protections, including equal protection, extend to state

25  prisons.  Walker v. Gomez, 370 F.3d 969, 974 (9th Cir. 2004); see also Freeman v. Arpaio, 125

26  F.3d 732, 737 (9th Cir. 1997) ("The Constitution's equal protection guarantee ensures that prison

officials cannot discriminate against particular religions."). The Supreme Court has recently

limited the holding in Turner in the equal protection context. See Johnson v. California, 543 U.S.

499 (2005). In Johnson, the Court held that strict scrutiny, and not the reasonableness standard

articulated in Turner, applies to prison racial classifications. Johnson, 543 U.S. at 510. The Court

noted "We think this unsurprising, as we have applied Turner's reasonable-relationship test only

to rights that are 'inconsistent with proper incarceration'" Johnson, 543 U.S. at 510. In so ruling,

however, the Court reaffirmed that Turner's reasonable relationship test continues to apply to

prisoner claims involving fundamental rights, including claims related to free exercise of religion,

free association, due process claims and the right to marry. Johnson, 543 U.S. at 510; see, e.g.,

Stewart v. Alameida, 418 F. Supp. 2d 1154 (N.D. Cal. 2006) (Turner's reasonable relationship

test continues to apply to First Amendment association claims after Johnson v. California). Here,

plaintiff's equal protection claim alleges that prison officials wrongly discriminated against him

based on membership with a religious group and/or improperly burdened his fundamental right to

free exercise of religion. That claim should be measured against the reasonable relationship

standard announced in Turner.

Applying that standard, the court finds that defendants have not shown that the

challenged policy withstands scrutiny under Turner. Defendants have failed to demonstrate that

the challenged policy was rationally related to legitimate penological state interests. Accordingly,

defendants' motion for summary judgment on plaintiff's equal protection claim should be denied.

**III. Immunity**

### A. Official Capacity

Defendants argue that they are entitled to summary judgment on any of plaintiff's

claims against them in their official capacity. They contend that the Eleventh Amendment

bars damages actions against state officials based on acts alleged to have been taken in their

official capacity. (Defs.' Mot. for Summ. J. at 7.)

/////

1    Plaintiff argues that he is entitled to seek injunctive relief against them in their

2    official capacity.  Plaintiff also argues that he has made clear that he is suing them in their

3    individual capacities too.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 12.)

4    Defendants arguments are persuasive with respect to this issue.  The Eleventh

5    Amendment bars plaintiff's damages claims to the extent that they are based on acts by defendants

6    in their official capacities.  Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989).  In Will,

7    the Supreme Court held that state officials acting in their official capacities are not "persons"

8    under § 1983."  491 U.S. at 71.  The Court reasoned that "a suit against a state official in his or

9    her official capacity is not a suit against the official but rather is a suit against the official's

10    office."  Will, 491 U.S. at 71.  The Court concluded that such a suit is therefore no different from

11    a suit against the state itself.  Id.

12    Accordingly, to the extent that plaintiff seeks monetary damages from defendants

13    in their official capacity, defendants' motion for summary judgment should be granted.[10]

14    **B.  Qualified Immunity**

15    Defendants argue that under the holding in Saucier v. Katz, 533 U.S. 194, 201

16    (2001), they are entitled to qualified immunity on plaintiff's First and Fourteenth Amendment

17    claims as well as his RLUIPA claim.  (Defs.' Mot. for Summ. J. at 31; Defs.' Reply at 5-6.)

18    Specifically, defendants contend that plaintiff has not demonstrated a violation of his RLUIPA

19    rights or his rights under the United States Constitution and has made no showing that the

20    defendants knew or should have known that they were violating plaintiff's rights under RLUIPA

21    /////

22

23    [10]  The court agrees with plaintiff that, "[w]hen sued for prospective injunctive relief, a
state official in his official capacity is considered a 'person' for § 1983 purposes."  See Doe v.

24    Lawrence Lovermore National Laboratory, 131 F.3d 836, 839 (9th Cir. 1997) ("a suit for
prospective injunctive relief provides a narrow, but well-established, exception to Eleventh

25    Amendment immunity"); see also Porter v. Jones, 319 F.3d 483, 491 ("suits against an official
for prospective relief are generally cognizable, whereas claims for retrospective relief (such as

26    damages) are not").  However, above this court has already recommended that plaintiff's claim
for injunctive relief be found moot.

1    or the First and Fourteenth Amendment.  Accordingly, defendants conclude that they are entitled

2    to qualified immunity.  (Defs.' Mot. for Summ. J. at 33-34.)

3            "Government officials enjoy qualified immunity from civil damages unless their

4    conduct violates 'clearly established statutory or constitutional rights of which a reasonable person

5    would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (per curiam) (quoting

6    Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The threshold question for a court required to

7    rule on a qualified immunity defense is whether the facts alleged, taken in the light most favorable

8    to the plaintiff, demonstrate that the defendants' conduct violated a statutory or constitutional

9    right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If no such right would have been violated even

10   if the plaintiff's allegations were established, "there is no necessity for further inquiries

11   concerning qualified immunity."  Id.

12           If a violation of a statutory or constitutional right is demonstrated by the plaintiff's

13   allegations, the court's next inquiry is "whether the right was clearly established."  Id.  This

14   inquiry must be undertaken in light of the specific context of the case.  Id.  In deciding whether

15   the plaintiff's rights were clearly established, "[t]he proper inquiry focuses on whether 'it would

16   be clear to a reasonable officer that his conduct was unlawful in the situation he confronted' . . . or

17   whether the state of the law in [the relevant year] gave 'fair warning' to the officials that their

18   conduct was unconstitutional."  Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (quoting

19   Saucier, 533 U.S. at 202) (citing Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 2511 (2002)).

20   Summary judgment in favor of defendants based on qualified immunity is appropriate if the law

21   did not put the defendants on notice that their conduct would be unlawful.  Saucier, 533 U.S. at

22   202.  Because qualified immunity is an affirmative defense, the burden of proof initially lies with

23   the official asserting the defense.  Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532,

24   1536 (9th Cir. 1992); Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

25           The court determined at screening that the facts alleged by plaintiff in his second

26   amended complaint, taken in the light most favorable to him, state cognizable claims upon which

38

1   relief may be granted.  First, with respect to plaintiff's First Amendment and RLUIPA claims, the

2   facts alleged by plaintiff concerning institutional policies governing religious publications and

3   mail at MCSP show that defendants violated plaintiff's constitutional and statutory rights by

4   imposing severe burdens and restrictions on religious mail and literature.  In addition, it was

5   clearly established in 2002 that prison inmates have a right to receive mail and publications not

6   prohibited by reasonable penological interests.  Thornburgh, 490 U.S. 401 (1989); Turner, 482

7   U.S. 78 (1987); Prison Legal News v. Cook, 238 F.3d 1145 (9th Cir. 2001); Walker v. Sumner,

8   917 F.2d 382 (9th Cir. 1990).  The state of the law in 2002 gave fair warning to defendants that it

9   would be unconstitutional to implement a policy that violated inmates' right to receive religious

10  mail and publications unless the policy was reasonably related to a legitimate and neutral

11  penological interest.  Defendants have not shown that the policies they implemented at MCSP in

12  late 2002 and early 2003 were reasonably related to a legitimate and neutral penological interest.

13  Contrary to defendants' argument, it should have been clear to reasonable prison officials in 2002

14  that their policies were not related to a legitimate and neutral penological interest and would

15  therefore violate inmates' rights.

16          Second, with respect to plaintiff's Equal Protection claim, the facts alleged by

17  plaintiff concerning institutional policies governing religious publications and mail at MCSP

18  would show that defendants violated plaintiff's equal protection rights by discriminating against

19  him and prisoners who practice a faith and prisoners who do not.  Pursuant to established prison

20  policies, prison officials returned "Me and My Big Mouth" to the sender, Joyce Meyer Ministries,

21  because they considered it a religious text and it had not been pre-approved.  Had prison officials

22  deemed it a secular text, plaintiff would have received the publication without having to complete

23  the pre-approval process.  It was clearly established in 2002 that "all persons similarly situated

24  should be treated alike."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432 (1985)

25  (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)).  The state of the law in 2002 gave fair warning to

26  defendants that they could not intentionally treat a group of inmates differently because of their

1  practice of religion, and if they did, they would be violating inmates' equal protection rights.  See

2  Freeman v. Arpaio, 125 F.3d 732 (9th Cir. 1997) ("The Constitution's equal protection guarantee

3  ensures that prison officials cannot discriminate against particular religions.").

4         Accordingly, defendants are not entitled to qualified immunity on plaintiff's

5  RLUIPA claim or his First and Fourteenth Amendment claims.  Therefore, their motion for

6  summary judgment on plaintiff's claims for damages should be denied.[11]

7                                **OTHER MATTERS**

8         Pursuant to Rule 201(b) of the Federal Rules of Evidence, amicus Pacific Justice

9  Institute has requested that the court take judicial notice of Jesus Christ Ministries v. California

10  Department of Corrections, 456 F. Supp. 2d 1188 (E.D. Cal. 2006).  Defendants have requested

11  that the court take judicial notice of its April 16, 2007 order in that same case approving the

12  stipulation for voluntary dismissal of that action.  The court will deny both requests as

13  unnecessary.

14                                **CONCLUSION**

15         Accordingly, IT IS HEREBY ORDERED that:

16         1.  Amicus Pacific Justice Institute's request for judicial notice of Jesus Christ

17  Ministries v. California Department of Corrections, 456 F. Supp. 2d 1188 (E.D. Cal. 2006) is

18  denied as unnecessary; and

19         2.  Defendants' request for judicial notice of its April 16, 2007 order in Jesus

20  Christ Ministries v. California Department of Corrections, 456 F. Supp. 2d 1188 (E.D. Cal. 2006)

21  is denied as unnecessary.

22         IT IS HEREBY RECOMMENDED that defendants' January 25, 2007 motion for

23  summary judgment be granted in part and denied in part as follows:

24  _____

25         [11] The court need not address defendants' claim that they are entitled to qualified
    immunity on plaintiff's due process claim given the court's recommendation that the claim be
26  dismissed.

1          1.  Defendants' motion for summary judgment with respect to plaintiff's request

2  for injunctive relief be granted;

3          2.  Defendants' motion for summary judgment in favor of defendants Woodford

4  and Alameida be granted;

5          3.  Defendants' motion for summary judgment in their favor on plaintiff's Due

6  Process claim be granted;

7          4.  Defendants' motion for summary judgment in their favor on plaintiff's claim for

8  damages against the defendants in their official capacity be granted;

9          5.  Defendants' motion for summary judgment on plaintiff's RLUIPA, First

10  Amendment, and Equal Protection claims be denied; and

11          6.  Defendants' motion for summary judgment based on their affirmative defense

12  of qualified immunity be denied.

13          These findings and recommendations are submitted to the United States District

14  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen

15  days after being served with these findings and recommendations, any party may file and serve

16  written objections with the court.  A document containing objections should be entitled

17  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to objections

18  should be filed and served within ten days after service of the objections.  The parties are advised

19  that failure to file objections within the specified time may waive the right to appeal the District

20  Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21  DATED: August 29, 2007.

22

23                                                      _____

24                                                      DALE A. DROZD
                                                        UNITED STATES MAGISTRATE JUDGE
25  DAD:9
    bess2498.57(2)
26